## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JAEHYUN KIM, ) | Civil Action No: |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| MASSACHUSETTS COLLEGE OF ) | |
| PHARMACY AND HEALTH SCIENCES, ) | |
| and JOHN DOES 1-10 ) | |
| ) | |
| ) | **JURY TRIAL DEMANDED** |
| Defendants. ) | |
| ) | |

### FIRST AMENDED COMPLAINT

Plaintiff Jaehyun Kim ("Plaintiff"), files this complaint for monetary and injunctive

relief against the Massachusetts College of Pharmacy and Health Sciences ("MCPHS

University") and alleges as follows:

### NATURE OF ACTION

1.     This is a civil action arising from Defendants' retaliation, abuse of a position of trust,

discrimination, breach of contract, and unfair and deceptive business practices arising

from a private university's misuse of disciplinary and administrative mechanisms as

punitive tools following protected activity.

2.     Plaintiff does **not** seek judicial review of academic judgment, grading decisions,

curricular standards, or pedagogical discretion as his expulsion was not based on

academic misconduct or dismissal.

3.  Plaintiff alleges that Defendants, acting through administrators, counselors, and agents, engaged in a course of conduct that included misleading inducement, failure to accommodate disability-related needs, retaliation for protected activity, coercive and threatening actions, and procedural irregularities.

4.  Plaintiff's expulsion from MCPHS was the culmination of this conduct, not its sole manifestation.

5.  Plaintiff alleges that MCPHS's actions violated federal and state law and caused significant educational, professional, and reputational harm.

## OVERVIEW OF KEY EVENTS

6.  Plaintiff enrolled in the Doctor of Pharmacy program at MCPHS University in September 2021 and received a $100,000 merit-based scholarship.

7.  Plaintiff and his family relied upon claims made by Judy Do, a long time legal guardian of Plaintiff, and employee of MCPHS when enrolling at MCPHS University.

8.  Beginning in 2021, Plaintiff reported repeated incidents of student misconduct, including race-related harassment and false statements about Plaintiff, to MCPHS administrators. MCPHS acknowledged these reports but declined to take corrective or disciplinary action.

9.  In Spring 2024, Plaintiff requested a Leave of Absence due to health-related difficulties. MCPHS treated the leave as a medical leave and imposed medical documentation requirements as a condition of Plaintiff's return.

10. MCPHS required additional documentation before allowing Plaintiff to return from leave.

11. Plaintiff was permitted to return only after submitting a second letter from a treating physician stating that he could return without restrictions.

12. Beginning in Fall 2024, Plaintiff began to use anonymous third party compliance channels to report his concerns.

13. In Fall 2024, MCPHS treated a message posted by Plaintiff in a Colleges of the Fenway fantasy football group chat as a conduct complaint and scheduled a Level 1 meeting.

14. Plaintiff was informed that the content of the message itself was not considered serious.

15. Plaintiff was nonetheless pressured to take a Leave of Absence rather than proceed with the scheduled process.

16. **On February 12, 2025,** MCPHS issued a written letter restricting Plaintiff's communications with University administrators and stating that a previously scheduled hearing would not be cancelled and that Plaintiff could not return to campus without completing it.

17. **On February 19, 2025,** Plaintiff received confirmation from the U.S. Department of Education Office for Civil Rights that his civil rights complaint against MCPHS had been received and assigned a case number.

18. **On February 20, 2025,** MCPHS separated Plaintiff from the University and issued a cease-and-desist letter and no-trespass order through outside counsel.

19. **On February 25, 2025,** MCPHS placed an expulsion notation on Plaintiff's academic transcript.

20. Before the expulsion notation was entered, Plaintiff did not receive written charges, an investigation report, a conduct hearing, written findings, or an appeal decision related to the expulsion.

21. These actions culminated in referral of selectively framed speech to law-enforcement authorities after Plaintiff's protected complaints.

22. In subsequent record productions to Plaintiff, MCPHS did not produce any written threat assessment or investigative findings supporting the expulsion decision.

23. Following the expulsion, MCPHS disabled Plaintiff's student email account and restricted all further communications to outside counsel.

24. Plaintiff alleges that these actions occurred shortly after protected complaints and requests for records and clarification, and that MCPHS failed to follow its published disciplinary procedures.

## THE PARTIES

25. Plaintiff Jaehyun Kim ("Plaintiff") is an individual and former Doctor of Pharmacy student of MCPHS University. At all relevant times, Plaintiff resided in Massachusetts and later in California.

26. Plaintiff Jaehyun Kim is a South Korean citizen and long term permanent resident of the United States of America.

27. Defendant Massachusetts College of Pharmacy and Health Sciences ("MCPHS") is a private institution of higher education located in Boston, Massachusetts, and is responsible for the policies, actions, and decisions described in this Complaint.

28. At all relevant times, Defendant MCPHS acted through its agents and employees, including Judy Do, who served both as Plaintiff's legal guardian for approximately ten years and as a counselor and Special Agreements Coordinator for MCPHS. By virtue of this relationship, Defendants owed Plaintiff fiduciary duties of loyalty, candor, and care. Defendants breached these duties by providing

misleading assurances regarding post-graduation outcomes, failing to disclose
material risks and conflicts of interest, and inducing Plaintiff's enrollment and
continued participation under tainted consent.

29.     Defendants John Does 1–10 are individuals employed by or acting as agents of MCPHS
University whose identities are not yet known to Plaintiff. These individuals participated
in, approved, or were responsible for administrative actions relating to Plaintiff's leave
classification, disciplinary escalation, record-keeping, and expulsion. Plaintiff will
amend this Complaint to substitute the names of these individuals once their identities
are ascertained through discovery.

30.     The following MCPHS administrators and personnel are referenced in the Factual
Allegations solely to identify their roles in events underlying this Complaint:

    A.     Carl Oliveri, Senior Associate Dean of Students, involved in decisions concerning
    Plaintiff's leave classification and administrative handling in Fall 2024.

    B.     Jacinda Félix-Haro, Dean of Students, involved in decisions concerning the
    placement of an expulsion notation on Plaintiff's academic record.

    C.     Kevin Nolan, Chief of Public Safety, involved in communications with Plaintiff
    regarding safety-related reports.

    D.     Devan Lalas, former Associate Director of Campus Life, involved in
    administrative interactions with Plaintiff.

    E.     AJ Andreucci, former Associate Dean of Students

    F.     Craig Mack, Associate Provost of Student Success

    G.     Judy Do, Special Institutional Agreements Coordinator and Korea Admissions
    Counselor

## JURISDICTION AND VENUE

31. **This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331** because this action includes claims arising under federal law.

32. **This Court has supplemental jurisdiction over Plaintiff's state law claims, including claims under Massachusetts General Laws Chapter 93A, pursuant to 28 U.S.C. § 1367(a)** because those claims are so related to the federal claims that they form part of the same case or controversy.

33. **Venue is proper in this District under 28 U.S.C. § 1391(b)** because a substantial part of events giving rise to the claims occurred within this District and the MCPHS conducts business in Massachusetts.

## FACTUAL ALLEGATIONS

### *Enrollment and Recruitment*

34. Plaintiff was enrolled in the Doctor of Pharmacy program at MCPHS University beginning in September of 2021.

35. Defendant MCPHS offered Plaintiff a $100,000 merit based scholarship applied as a tuition reduction over the course of enrollment.

36. Plaintiff accepted this scholarship.

37. The scholarship was not a cash payment but a discount against tuition owed.

38. Plaintiff relied on the availability of this financial aid in deciding to enroll and continue in the program and incurred substantial net tuition and reliance costs notwithstanding the scholarship.

39.  Upon information and belief, Defendant's scholarship awards are typically applied as tuition reductions rather than cash payments, and Plaintiff does not allege that the scholarship constituted a cash grant.

40.  As part of the admissions process, MCPHS University representatives including Judy Do made statements regarding the professional outcomes of the program.

41.  Judy Do was a long time legal guardian of Plaintiff arranging for his immigration to the United States at 9 years old starting in 2009.

42.  Plaintiff's family paid Ms. Judy Do approximately $35,000 per year through Plaintiff's high school graduation in connection with her role as Plaintiff's legal guardian.

43.  Plaintiff does not allege, and lacks access to information confirming, whether these payments included or offset any tuition or educational costs for Plaintiff's middle school or high school education, or whether such educational costs were billed separately.

44.  The structure and allocation of these payments, including any interaction with Defendant MCPHS's admissions, enrollment, recruitment, tuition, or financial aid practices, are matters uniquely within Defendants' and Ms. Do's control.

45.  She, however, did not house or feed Plaintiff herself and was rarely in contact with Plaintiff, usually only in contact for doctor's appointments, acting only as a middleman between Plaintiff and his host family.

46.  The host family received less than $1000 a month to house, feed, clothe, and take care of Plaintiff.

47.  Ms. Do had run her own education and college admissions services company, Honors College Prep, based out of Ellicott City, Maryland.

48. Ms. Do had been a representative of MCPHS University from the time Plaintiff was contracted with her business and actively tried to pressure Plaintiff into enrolling at MCPHS University at time of Plaintiff's high school graduation in 2018.

49. Ms. Do had recruited many of her students to enroll at MCPHS University.

50. Ms. Do pressured students, many underage, before their college admissions decisions, saying, "You will not be taken seriously in the United States if you aren't a pharmacist or a doctor with a license."

51. This exact sentence was repeated again to Plaintiff, when he was trying to decide what university he wished to enroll in 2020 after a gap year to work with his grandfather on his wide-ranging businesses.

52. Plaintiff had been homeless after the summer of 2019 after his first stint in college, and experienced deep financial difficulty.

53. At this time, Plaintiff had received offers from other top universities around the world with matching scholarship offers and further guarantees including admissions into honors programs.

54. Plaintiff and his family starting in 2020 began to speak with Judy Do extensively to decide if the university was worth investing almost $200,000 of tuition into.

55. Plaintiff and his family asked specific questions regarding the University as Plaintiff was unsure about the quality of MCPHS's program by way of its rankings, the PharmD program being put on probation once before, and the general state of pharmacy as a career.

56. Ms. Do stated that MCPHS is not ranked because they do not pay for rankings.

57.    Ms. Do also stated that graduates of the PharmD program consistently secured

employment and that completing the degree would enhance Plaintiff's future

professional prospects in the United States of America.

58.    As part of MCPHS University's recruitment and enrollment outreach, its representative

Judy Do communicated with Plaintiff's grandfather, providing information that

influenced Plaintiff's decision to enroll, including the facts below.

59.    MCPHS markets itself as #3 in the country for its economic value.

60.    MCPHS claims that they are the #1 university in the country for earning power in the

United States.

61.    MCPHS claims to be the #4 most transformative college in the United States.

62.    MCPHS has signed a Memorandum of Understanding with the Korean Evaluation

Institute of Technology, a state-run evaluation institute, to further cooperate in the

development and growth of South Korean students.

63.    Plaintiff and his family were further promised by Judy Do that she would assist in any

ways possible in her capacity.

64.    In or about 2022, Ms. Do continued to arrange academic support for Plaintiff by

coordinating tutoring services through a former MCPHS alumnus.

65.    Plaintiff sought such outside assistance only after MCPHS did not provide meaningful

academic support resources in response to Plaintiff's requests, including being informed

by an administrator that student tutors were "not expected to tutor."

66.    This further reinforced Plaintiff's reliance on Ms. Do's guidance and external support.

67.    However, when Plaintiff tried to reach out to Do to request help after 2022, Do did not

respond.

68.     Plaintiff and his family relied on these representations when deciding to enroll at, and pay tuition to MCPHS University, including statements by other admissions representatives of MCPHS University that the PharmD program provided a reliable pathway to employment and that graduates routinely secured positions shortly after completion emphasizing the program's strong career outcomes.

69.     These representations were especially significant to Plaintiff and his family given Plaintiff's immigrant background, their fiduciary and long time relationship with Do, and their understanding of the program's role in supporting long-term career and financial stability.

### *Public Safety Interactions*

70.     Almost immediately after his enrollment at MCPHS University beginning in Fall 2021, Plaintiff began encountering concerning behavior from students, exaggerated and intensified by administrators' inaction.

71.     Plaintiff received violent messages such as, "If Jaehyun Kim's body were to be thrown in the Charles River, would it float?"

72.     These messages were further accompanied by unwanted physical contact, including a physical push witnessed by another student.

73.     However, Plaintiff was assumed to be in the wrong and was called into the Public Safety office accused of "bullying" and "harassing" the aggressor.

74.     It was only after Plaintiff explained the true circumstances that Public Safety apologized for making assumptions.

75.     These events culminated in Plaintiff asking for a no contact order from the University which they granted against two students.

76. On July 7, 2023, Plaintiff filed a formal incident report with MCPHS Public Safety detailing misconduct by officers Frizzell and Hoang, including threats to report Plaintiff to Student Affairs and refusal to permit entry despite Plaintiff providing valid identification, delaying Plaintiff's entry by about 45 minutes.

77. The officer in question, Sergeant Frizzell, threatened to report Plaintiff due to "his attitude."

78. After filing the report, Plaintiff was called to the Public Safety office where two officers including Kevin Nolan, cornered Plaintiff and tried to force him to admit that he was responsible for the situation, despite Plaintiff providing identification and complying with instructions.

79. There were no disciplinary actions taken against Plaintiff for the incident.

80. There were no disciplinary actions taken against Frizzell or Hoang.

81. During the Summer 2023 semester, Plaintiff was involved in a dispute within a University-recognized professional organization regarding a leadership position. Plaintiff formally requested mediation through the Assembly of Clubs and Professional Organizations. University administrators, including Devan Lalas, declined to initiate formal mediation and directed Plaintiff to resolve the matter informally with peers.

82. Subsequently, the dispute was escalated to Public Safety and Student Affairs without a formal investigation or adjudication of misconduct.

83. Plaintiff was later subjected to an administrative hearing held by AJ Andreucci and removed from his leadership position without being provided factual findings or a written explanation beyond generalized references to 'behavior.'

84. Plaintiff was encouraged by University administrators to resolve the matter by accepting an informal agreement, with representations that the issue would 'go away' if Plaintiff complied.

85. Plaintiff agreed in order to move forward and continue his academic and professional pursuits.

### Spring 2024 Medical LOA

86. Plaintiff began to struggle academically due to his deteriorating health and was subsequently put on academic probation for the Spring 2024 semester.

87. In or around Spring 2024, Plaintiff requested a Leave of Absence. MCPHS personnel treated the leave as a medical leave and imposed medical documentation requirements as a condition of return.

88. MCPHS Counseling Services and Student Affairs were aware that Plaintiff had been diagnosed with a mental-health condition by MCPHS's own outside providers.

89. MCPHS relied upon this condition and previous counseling session to approve the medical leave of absence.

90. Plaintiff fulfilled all requirements for his return including confirmation that he had been diagnosed with Adjustment Disorder due to his repeated stresses from the MCPHS environment.

91. This was in direct contradiction and a completely separate diagnosis from MCPHS's own outside providers.

92. MCPHS questioned and doubted Plaintiff's medical condition.

93. Still trying to revive his status as an active student, Counseling refused to let Plaintiff back in claiming that he did not receive proper treatment as required.

94. Before returning from his Leave of Absence Plaintiff made a protected complaint to Oliveri about a possible sexual crime stemming from a Snapchat picture circulated by a student.

95. This student had also engaged in racially-motivated gestures against Plaintiff, in which he pulled the corner of his eyes directed at Plaintiff.

96. This incident occurred on campus, during normal academic hours.

97. A week later, Oliveri said the complaint in its entirety was dismissed without further detail.

98. Only a second letter from Doctor Li stating that Plaintiff was eligible to return without restrictions initiated Plaintiff's return from his LOA.

### *Return, Intimidation, and Hearings*

99. In Fall 2024, Plaintiff returned to campus and was enrolled as an active student.

100. Plaintiff was beginning to excel academically again and was beginning to bring his grades back up.

101. Plaintiff to this point had been appointed president of two professional organizations and received numerous awards related to his volunteering work.

102. Plaintiff had worked as a marketing intern at a healthcare startup while working at a hospital as a pharmacy technician.

103. Plaintiff had also gained experience working inside MCPHS University's admissions office as a "Brain Cell", a student admissions ambassador.

104. In the Summer of 2023, Plaintiff had witnessed former Associate Admissions Director Allison Gravois directing tour guides to divert from their routes in an attempt to misdirect attention from Korean students holding up signs saying, "Do not come here."

105.   Plaintiff also actively gained alumni connections including Ernest Gates, a Trustee
       Emeritus and Michael Castagna, CEO of Mannkind, a large pharmaceutical company.

106.   Both of these alumni offered to help find jobs for Plaintiff in their companies and in their
       capacity.

107.   Prior to his return, Ernest Gates advised against returning to the University as he warned
       Plaintiff saying, "They could set you up."

108.   He also told Plaintiff that, "I've never seen such a hostile environment before. If this was
       my son I'd tell him to transfer."

109.   Plaintiff began using anonymous third party reporting channels provided by the
       University to report the University's inactions in previous matters.

110.   No action was taken to Plaintiff's knowledge.

111.   Plaintiff filed an anonymous Student Affairs survey regarding his previous incidents.

112.   The contents of the survey contained detailed information regarding previous Public
       Safety and Student Affairs issues.

113.   In Fall 2024, Plaintiff participated in a Colleges of the Fenway ("COF") fantasy football
       league that included MCPHS and WIT students.

114.   This incident occurred outside of campus grounds.

115.   Plaintiff posted jokes in the league group chat.

116.   Plaintiff was subsequently removed from the league.

117.   Plaintiff was notified by other students in writing that they clearly understood the jokes
       to be funny, and that they did not take offense.

118. The complaint did not come from any students involved in the league, but instead was initiated by a student supervisor and administrators associated with COF's inter-institutional activity oversight that disagreed with Plaintiff.

119. Later written records show that students expressed disbelief that this resulted in an expulsion, let alone a conduct complaint.

120. Certain administrators in the Student Affairs team took these complaints, and initiated a Level 1 hearing.

121. Plaintiff was then notified of alleged conduct violations and a Level 1 meeting was scheduled by certain MCPHS administrators including AJ Andreucci.

122. Plaintiff then filed a formal complaint alleging a hostile environment, and asked to clarify what exactly Plaintiff did wrong.

123. In the complaint, Plaintiff alleged bias and vindictiveness displayed by Andreucci and called upon him to step down from the hearing and cancel it in its entirety.

124. AJ Andreucci agreed and stepped down from the meeting.

125. Almost immediately after, however, Plaintiff's level 1 hearing was cancelled and instead escalated to a level 2 hearing.

126. The hearing only escalated after Plaintiff's formal complaint.

127. The materials used in the escalation of the hearing consisted of old messages arising from a personal business relationship between Plaintiff and a MCPHS student that used to be friends.

128. The University was in possession of these messages long before the issuance of the level 1 hearing notice.

129. The text messages in question occurred off campus.

130.  On October 2, 2024, Oliveri asked to meet with Plaintiff in his office.

131.  Due to a scheduling conflict, this meeting was moved to Zoom for the following day.

132.  In this meeting, Oliveri told Plaintiff he was not supposed to be relaying this information to Plaintiff.

133.  When called into Oliveri's office to discuss the escalation of events Oliveri made it clear that he was not involved in the decision making of the hearing, although he was above the decision makers in the hierarchy.

134.  Oliveri claimed that the order for the escalated hearing "came from his boss's boss."

135.  Oliveri then told Plaintiff that he had not been able to read the substance or the materials in question.

136.  When reading the jokes and text messages in question, Oliveri claimed that there was nothing wrong with what Plaintiff had done.

137.  Plaintiff then reported to Student Affairs that this student had sent written messages referencing poisoning, initiating unwanted physical contact, implied that he would take hostile action against Plaintiff's grandfather, and threatened Plaintiff's business reputation and relationships with important hospital administrators at Beth Israel Hospital.

138.  The student in question, separate from the 2021 incident, had told students that, "If someone were to die from Propranolol I'll take the credit for it."

139.  Students expressed extreme discomfort and were noticeably shaken.

140.  Nevertheless, the student continued to make these remarks.

141.  The student further expressed sentiments that he "wanted to make Plaintiff's grandfather give up."

142. The student had also made other threatening comments related to Plaintiff's ethnicity.

143. These comments included statements such as, "There are simply too many ch[slur]ks to kill to deal with them all."

144. The student then went on to offer poisoning options when referencing Harvard students saying, "Why don't you just inject them with Succinylcholine and it'll never be detected."

145. Plaintiff expressed discomfort with the student's behavior and told him that he was out of line.

146. The student later said, "Forget that I offered poisoning options."

147. Plaintiff provided these messages to the University.

148. Later records show that the University dismissed Plaintiff's complaint without providing findings or investigative support.

149. The student in question was fired from Beth Israel Hospital due to concerns directly related to this matter.

150. The University, however, refused to take action and characterized Plaintiff's complaint as 'malicious'.

151. During this closed door meeting, Oliveri then raised his voice and told Plaintiff that he had two options: To take a Leave of Absence or to go through with the hearing.

152. Oliveri also told Plaintiff that Plaintiff could choose to return after getting his bachelor's degree elsewhere.

153. Plaintiff was then told that the LOA would have to be a Medical Leave of Absence.

154. Plaintiff then told Oliveri that he did not wish for the Leave to be classified as medical.

155. Oliveri told Plaintiff that he "needed help".

156. Before signing the LOA, Oliveri told Plaintiff to leave the reason for the LOA blank.

157. Plaintiff signed the LOA and prepared to return home to Korea.

158. Before leaving for Korea, he met with Officer Twombly to formally report the student's remarks.

159. Plaintiff then told Oliveri that he wished to start an investigation against the student who reported him due to ongoing harassment from the student.

160. About two days after the phone call, Plaintiff went back to Korea due to his "Leave of Absence."

161. Plaintiff then received a message that attacked Plaintiff's mental health and alleged deportation from another student related to the previous student during his Leave of Absence.

162. The message told Plaintiff, "I heard that you got deported. Good riddance. Go die alone you schizophrenic pu[slur]y."

163. Plaintiff also received a picture of another student using a racial epithet directed towards African Americans.

164. The picture in question contained the word ni[slur]er.

165. Plaintiff immediately reported both of these statements to Student Affairs using his student email.

166. Student Affairs did not respond citing Leave of Absence procedures.

167. Oliveri then reached out to Plaintiff threatening Plaintiff with sanctions if he did not stop emailing Student Affairs.

168. Carl Oliveri emailed Plaintiff saying, "Don't talk to anyone else about this matter."

169.    On November 12, 2024, Plaintiff met with Steven Crosby to discuss his Leave of
        Absence amongst other matters.

170.    When asked about how he could prepare to catch up in regards to his program, Crosby
        told Plaintiff, "Just focus on getting your health back in order."

### *Expulsion*

171.    On November 26, 2024, Plaintiff requested his FERPA documents.

172.    Shortly after Plaintiff received his FERPA documents.

173.    Plaintiff noticed that some records especially in regards to his disciplinary measures and
        reports were absent, mischaracterized, or false.

174.    On December 2, 2024, Plaintiff emailed Hilary Theofane asking to have his records
        amended as is lawful under federal law.

175.    Theofane did not respond.

176.    Plaintiff contacted Student Financial Services and other administrators through proper
        documented channels and through his emails in an attempt to recoup at least a part of his
        tuition.

177.    In a Zoom meeting with Felicia Sorrentino Plaintiff explained his circumstances.

178.    Sorrentino then communicated to Plaintiff that she needed to check with Carl Oliveri or
        the appropriate Dean of Students for a possible refund, and stayed firm on denying
        Plaintiff's request.

179.    Almost 30 minutes after the meeting, Sorrentino communicated to Plaintiff that Oliveri
        had told her that Plaintiff could appeal his Leave of Absence.

180.    Plaintiff then asked why a LOA would need to be appealed if it was not coerced and if it
        was not a disciplinary measure.

181. Sorrentino apologized saying, "On behalf of the University, I apologize."

182. Sorrentino then said she would escalate the matter to Elizabeth Goreham, then the Director of Student Financial Services.

183. In an email exchange, Elizabeth Goreham reached out to Plaintiff almost a week later, but asked if Plaintiff was in Hong Kong.

184. Plaintiff responded that he was a Korean citizen and that Hong Kong is not South Korea and is instead an entirely different country.

185. Despite the initial exchange, Plaintiff scheduled a meeting with Goreham in an attempt to discuss his financial situation.

186. A day before the scheduled meeting, Plaintiff cancelled the meeting due to his grandfather undergoing emergency surgery due to his deteriorating health.

187. Goreham did not attempt to reach out with Plaintiff to reschedule.

188. Plaintiff then reached out to President Richard Lessard in an attempt to schedule a meeting.

189. Plaintiff did not receive a message from President Lessard.

190. Instead, Associate Provost Craig Mack reached out to Plaintiff by way of a phone call.

191. They agreed to meet sometime later.

192. Before the Mack meeting, Plaintiff submitted a records request to Evan J. Collyer to gather all public safety reports related to his name.

193. This request was acknowledged by Collyer.

194. Two weeks later, Collyer denied the request citing MCPHS policy against distributing such materials, no matter the relationship between the reports and the requester.

195. Plaintiff replied citing FERPA, saying his requests were lawful.

196.  Plaintiff did not receive a response.

197.  In early January, Plaintiff reached out to Councillor Sharon Durkan to discuss his
      mistreatment at MCPHS University.

198.  Her assistant, Lily Sweeterman, told Plaintiff that she would "reach out to the
      University."

199.  After these events, on January 15, 2025, Plaintiff met with Craig Mack, Anna Morin,
      and Plaintiff's grandfather on Zoom as part of his request to meet with issues regarding
      his time at MCPHS University.

200.  This meeting was not recorded.

201.  Plaintiff asked why Mack was present in the meeting as he had previously reached out to
      Morin specifically and Plaintiff did not ask to speak to Mack.

202.  During the January 15, 2025 meeting, Associate Provost Craig Mack referenced a
      prior, unrelated matter that had been dismissed without a finding, without
      explaining its relevance to the disciplinary proceedings at issue.

203.  The referenced incident occurred in 2022, was dismissed without findings in early
      2024, and was not revived, referenced, or relied upon by Defendants until 2025,
      well after Plaintiff engaged in protected activity.

204.  Plaintiff then raised awareness of other students' misconduct.

205.  Mack responded, "What they do doesn't matter."

206.  Plaintiff further observed that the escalation of the disciplinary proceedings and
      the incident involving Devan Lalas occurred shortly after the applicable tuition
      refund deadlines had passed.

207.  Mack then requested a list of demands and Plaintiff obliged.

208. Plaintiff requested investigatory materials related to his escalated disciplinary matters, accommodations for transfers to different universities, an apology due to mistreatment by the university.

209. On February 3, 2025, Plaintiff emailed Richard Lessard a formal complaint regarding his treatment at the university.

210. On the same day, Plaintiff filed a complaint against MCPHS University through the Department of Education's Office of Civil Rights - Boston.

211. The letter contained detailed information about his mistreatment on campus, alleging retaliation, mistreatment, improper uses of the disciplinary system, and a hostile environment amongst other matters.

212. No acknowledgement or response was received.

213. Following Plaintiff's submission of written concerns to various MCPHS administrators, including questions regarding the handling of prior incidents, the escalation of his conduct matter, and the classification of his leave, MCPHS University's response shifted from addressing the substance of Plaintiff's inquiries to warning Plaintiff not to communicate with certain administrators.

214. On February 12, 2025, Associate Provost Craig Mack issued a written letter to Plaintiff stating that Plaintiff's attempts to obtain clarification regarding his disciplinary status constituted a "disregard of the proper communication channels," and that any further attempts to seek information could "result in the commencement of an additional disciplinary matter."

215. The letter directed Plaintiff not to contact senior administrators, including the University's President, regarding his case.

216. The Student Handbook directs students to contact the Office of the President if they are having issues with the Dean of Students.

217. The February 12 letter further stated that Plaintiff's previously scheduled hearing "will not be cancelled under any circumstances" and that Plaintiff could not return to campus without completing it.

218. The letter also informed Plaintiff that no MCPHS personnel had acted in a manner warranting an apology, notwithstanding Plaintiff's written reports concerning deficiencies in the handling of prior incidents and concerns regarding procedural irregularities.

219. The letter stated that no student was "entitled to any investigatory information," and that Plaintiff's requests for clarification on the basis of the escalated conduct matter would not receive further response.

220. The tone and content of the correspondence indicated that decisions regarding Plaintiff's disciplinary status had been made prior to any formal process and that substantive questions concerning the grounds for the escalation would not be addressed.

221. The correspondence further banned Plaintiff from campus during his Leave of Absence, without citing any reason.

222. These events occurred after Plaintiff had raised concerns regarding the handling of his case, the classification of his leave, and inconsistencies in the University's conduct process.

223. Plaintiff during his Leave of Absence had used his student email strictly to contact administrators and schedule meetings in regards to his Leave of Absence and to discuss his issues and possible accommodations at the University.

224. In early November, Plaintiff received a message circulating amongst students that contained language referencing "gassing a room" which Plaintiff understood as threatening.

225. **On February 18, 2025,** Plaintiff reported this incident in a Town Hall Survey.

226. Plaintiff alleges that no written findings or threat assessment were provided to Plaintiff in response to his report.

227. Plaintiff alleges that, following these events, MCPHS revised its policies governing school-wide or mass student email communications, underscoring the feasibility of precautionary measures and the seriousness of the risk raised by Plaintiff's report.

228. **On February 19, 2025,** Plaintiff received confirmation from OCR (Boston) that his submission had been received and assigned a case number.

229. **On February 20, 2025,** MCPHS decided to separate Plaintiff from the University.

230. **The same day,** Plaintiff received a Cease and Desist along with a No Trespass Order from Timothy J. Fazio, outside counsel for MCPHS University by way of Plaintiff's personal work email.

231. **These actions were taken only after Plaintiff informed the University of his intention to sue and after becoming a federally protected complainant.**

232. Fazio stated that Plaintiff was not able to apply for an appeal despite the Handbook showing that an appeal would be provided and that the decision to expel was final.

233. Plaintiff emailed Fazio on February 21, 2025 asking for a reasoning to the expulsion.

234. After Plaintiff's expulsion, MCPHS University disabled Plaintiff's student email account. As a result, Plaintiff lost access to numerous communications relevant to the

events described in this Complaint, including messages previously exchanged with University officials, Public Safety personnel, and members of his academic cohort.

235.   Following Plaintiff's attempts to obtain clarification regarding the status of his conduct case, the classification of his Leave of Absence, and the escalation of administrative actions taken against him, MCPHS began directing Plaintiff to cease communications with University personnel and to route all correspondence through Fazio.

236.   **On February 21, 2025,** Attorney Fazio, writing on behalf of MCPHS University, informed Plaintiff that his recent communications to administrators constituted behavior that had "risen to a level of concern for the safety of members of the University community."

237.   Plaintiff had been in South Korea with his family at the time of expulsion and the alleged "safety" threat.

238.    The correspondence stated that any further communication could result in additional disciplinary action, and **asserted that Plaintiff was "no longer a member of the MCPHS University community," despite Plaintiff having never received written notice of charges, an investigation, a conduct hearing, or findings.**

239.   Attorney Fazio further instructed Plaintiff that he was "not entitled to seek return from [his] leave of absence," and that he was prohibited from accessing University resources "now or in the future," except for limited administrative purposes.

240.   **MCPHS did not provide any explanation for this sudden and permanent change in status,** nor did it reference any policy authorizing such action outside of a formal conduct process.

241.    MCPHS University does not have a policy regarding conduct cases being controlled by outside counsel rather than through the University's Student Affairs or Conduct Office.

242.    MCPHS's Student Handbook and disciplinary policies prohibit attorney participation in student disciplinary proceedings and frame such matters as educational processes administered by Student Affairs. Students are not permitted to have counsel participate in any conduct proceeding.

243.    These actions departed from MCPHS's published disciplinary procedures and replaced the educational conduct process promised to students with counsel-driven enforcement measures.

244.    Plaintiff communicated to Fazio that he was in South Korea and questioned what basis the University had for alleging that Plaintiff was a threat.

245.    **On February 21, 2025,** Plaintiff asked for official correspondence from the University including an official letter of separation.

246.    To this point, there was no official correspondence from the University regarding Plaintiff's disciplinary expulsion.

247.    **On February 24, 2025,** Plaintiff received a written separation letter signed by Dean Félix-Haro.

248.    **On February 25, 2025,** MCPHS entered an expulsion notation on Plaintiff's transcript ordered by Jacinda Felix Haro to University Registrar Taylor Horner.

249.    **There were no threat assessments alleging Plaintiff to be violent, hostile, or threatening.**

250.    The content of the February 24 letter of separation also indicated that Plaintiff's student status had been predetermined and that the decision was final, without regard to

Plaintiff's academic standing or compliance with University requirements, and did not take into account the totality of the circumstances surrounding Plaintiff's enrollment including Plaintiff's requests for accommodations, a hostile environment, repeated requests for intervention and help, due to continued attacks from students and administrators, leading to Plaintiff's drop in mental and physical health. Despite MCPHS's previous written statement that Plaintiff's return depended on the completion of a conduct hearing, no hearing was ever scheduled or conducted before the expulsion notation was entered.

251. On March 19, 2025, Plaintiff filed a FERPA disclosure prevention form to MCPHS.

252. On or around April 2, 2025, Plaintiff began posting publicly about his treatment and struggles at MCPHS University through his social media platform on LinkedIn.

253. Plaintiff remained in South Korea at the time of said posts.

254. On April 7, 2025, Plaintiff received an email from Fazio notifying Plaintiff that his public posts were seen and circulated by students at the university.

255. Fazio communicated to Plaintiff that his public posts were seen as emotional venting and not threatening to the university community.

256. Fazio also stated that his public posts, while not constructive, were fine if Plaintiff wished to vent emotionally publicly.

257. Through his public campaign, Plaintiff received a tip from a university professor that his recommendations were blocked due to the University ordering its professors and employees to not have any contact with Plaintiff.

258. Plaintiff at the time was actively trying to apply for transfers to various universities.

259.    Plaintiff was told by various universities that it was almost impossible to transfer due to his expulsion and that his only option left might be community college.

260.    In his home country of South Korea during the month of April, Plaintiff had engaged in political meetings with high ranking opposition leaders including Deputy Speaker Lee Hak Young of the National Assembly.

261.    Plaintiff had become increasingly vocal about decrying declarations of martial law in his home country, posting frequently in his private Instagram account.

262.    Plaintiff had shown that he was physically present in South Korea by way of Instagram.

263.    Shortly after his meeting with opposition leaders, Plaintiff posted a short message including the word 'kill' on his Instagram Notes, a casual platform intended for only his private friends.

264.    This note was not directed towards the University, occurred after his expulsion, posted while Plaintiff was in South Korea, was directly related to his political meanings, was not directed at any individual or group, a month after his expulsion, and only after meeting with Korean opposition leaders.

265.    University officials by way of student liaisons had been keeping track of his personal Instagram.

266.    The University knew that Plaintiff was in South Korea.

267.    The liaisons along with Kevin Nolan then mischaracterized these notes and submitted them along with selective sections of his LinkedIn posts to the Boston Police Department, all while Plaintiff was in South Korea with his family.

268.    The University did not attempt any threat assessments, did not verify what context this was posted in although clear, and there were no attempts to reach out to Plaintiff.

269. Following Plaintiff's expulsion and after his arrival from South Korea in late April, officers from the Boston Regional Intelligence Center contacted Plaintiff at his residence regarding public statements he had made about his experience at MCPHS University appearing in plainclothes.

270. The contact occurred after the University had already issued its expulsion decision and did not precede or inform any disciplinary process.

271. Detective Anjos said that there was no criminal conduct, threat, or imminent risk.

272. Instead he told Plaintiff that, "In my opinion you're not doing anything wrong, you're hitting them hard using your rights."

273. He further explained that "Kevin Nolan does not have power to write these reports on his own whims. The only person who would have the power to write these reports against you would be the University Chancellor."

274. He told Plaintiff that he would reach out to the University to notify them that there was nothing wrong.

275. In contrast, other students who had expressed frustrations towards specific members of the MCPHS community by way of their Instagram Notes were not met with law enforcement referrals.

276. Shortly after, Plaintiff reached out to his local elected officials including Representative Chynah Tyler and Dan Ryan.

277. On behalf of Representative Tyler's office, an assistant told Plaintiff that "this is not normal."

278. Both offices reached out to Attorney Fazio to investigate.

279. Both representatives received a reply from Fazio stating that, "Plaintiff violated policies and is not allowed on campus."

280. Shortly after, Plaintiff received a phone call from Anjos.

281. Anjos told Plaintiff that he had relayed to the University that there wasn't a safety threat and made it clear to tell the University that, "The University does not tell Boston Police or us what to do."

282. Despite this fact, the University continued to bar Plaintiff from campus and continued to hold Plaintiff's status as expelled.

283. Plaintiff then went back to Korea in early May.

284. Plaintiff arrived back in Boston around August 2025.

285. After arriving in Boston, Plaintiff reached out to Councillor Durkan's office again.

286. He met with Anthony Baez, Director of Operations for Councillor Durkan.

287. After retelling the events, Baez told Plaintiff that these events were not normal and that the timeline was much too striking to be left alone.

288. Baez then told Plaintiff that he would reach out to Sweeterman to check with her regarding this matter.

289. On August 18, 2025, Plaintiff requested his FERPA documents for the second time.

290. Plaintiff requested to include disclosure logs, all educational records, and all other relevant disciplinary information as required by federal law.

291. On October 1, 2025, MCPHS produced FERPA documents, redacted heavily and not containing the information that Plaintiff asked for.

292. These documents also contained documents unrelated to the expulsion that the University had prior to the 1st FERPA document request.

293.  Fazio claimed in an email exchange that the university is not required to provide disciplinary information and strongly encouraged Plaintiff to take a settlement to move on with his life.

294.  Fazio and Plaintiff then spoke on the phone to discuss "whatever Plaintiff wished to talk about".

295.  When Plaintiff asked about a reasoning for his expulsion, Fazio claimed, "I will not argue with you" and did not provide a reasoning for his expulsion.

296.  Counsel further attempted to deny the existence of police reports against Plaintiff, instead saying, "We give the No Trespass Order to Boston Police and they choose what to do with it" despite the University filing police reports a month after his expulsion and when Plaintiff was in South Korea.

297.  Counsel proposed resolving the matter through a small tuition refund of $5000, conditioned on Plaintiff deleting public posts and agreeing to confidentiality; Plaintiff declined.

298.  In the FERPA production provided to Plaintiff, MCPHS did not produce written threat assessment materials or investigative findings supporting the expulsion decision.

299.  Plaintiff then requested the disclosure logs, transfer college report, a reasoning for the expulsion attached to the transfer college report, and further investigatory and disciplinary material required by federal law and university policy, including FERPA-governed obligations.

300.  Plaintiff also requested a hearing to amend records.

301.  MCPHS declined to hold a hearing saying Plaintiff was not entitled to said hearing.

302.  MCPHS did not respond to the targeted FERPA requests.

303. On September 12, 2025, MCPHS was properly served with a 93A demand letter.

304. On October 14, 2025, MCPHS served a response to Plaintiff by email, past the statutory deadline of a proper response to a 93A demand letter.

305. MCPHS failed to make a reasonable good faith offer, offering nothing.

306. MCPHS instead focused attention on Plaintiff's social media activity, and claimed they would countersue for harassment and defamation.

307. On November 1, 2025, Plaintiff requested to inspect the daily crime log at WIT and MCPHS under the Clery Act.

308. MCPHS did not respond as required under federal law.

309. Plaintiff received a public records search that there were 2390 pages of email searches related to his name throughout the Boston Regional Intelligence Center and Boston Police database.

310. Plaintiff also received a public records search that there were internal affairs files related to his name and the aforementioned detectives from the Boston Regional Intelligence Center.

311. Plaintiff is currently trying to receive the full extent of these materials.

312. On November 25, 2025, MCPHS was served with a 93A rebuttal letter.

313. On December 1, 2025, MCPHS was served with a qualified settlement offer to resolve all matters.

314. As of December 18, 2025, there was no response or acknowledgment from MCPHS regarding these communications.

315. Plaintiff has ongoing FOIA requests related to these matters.

316. MCPHS University receives federal funding.

317. MCPHS is a private university bound by its published handbook and basic principles of fair dealing.

318. Plaintiff had spent over $200,000 in tuition and over $180,000 in living and schooling expenses including rent over the 4 years he was enrolled at MCPHS University.

319. Plaintiff did not receive a degree of any kind from MCPHS University.

320. Plaintiff's job offers related to MCPHS alumni disappeared after his expulsion.

321. Plaintiff's credits do not transfer to all universities.

322. Due to the expulsion notation on Plaintiff's transcript, a transfer to another institution is not possible due to the good standing requirement by universities.

323. MCPHS was served with a courtesy copy of the original complaint on December 24, 2025.

## CLAIMS FOR RELIEF

### COUNT I: RETALIATION UNDER ADA/§504

324. Plaintiff realleges and incorporates by reference the preceding paragraphs.

325. Plaintiff engaged in protected activity by requesting a medical leave of absence, seeking accommodation for a mental-health condition, and opposing the University's handling of his medical status and related disciplinary escalation.

326. Plaintiff was otherwise qualified to participate in the Doctor of Pharmacy program and met applicable academic requirements for continued enrollment, and Defendants' actions were not based on academic dismissal.

327. MCPHS University was aware of Plaintiff's protected activity.

328. After Plaintiff engaged in protected activity, MCPHS subjected Plaintiff to adverse actions, including escalating disciplinary proceedings, restricting communications,

issuing a no-trespass order, and expelling Plaintiff from the Doctor of Pharmacy program.

329. The adverse actions occurred during Plaintiff's protected activity, were accompanied by Defendants' disability-related escalation of administrative measures (including coercive leave classification and restrictions), refusal to engage in a documented interactive process, abandonment of promised procedures, and imposition of coercive restrictions, supporting a plausible inference that Defendants' actions were retaliatory rather than the result of neutral enforcement.

330. Their actions were not preceded by a conduct investigation, notice of charges, a hearing, or written findings.

331. MCPHS's actions would dissuade a reasonable student from engaging in protected activity.

332. MCPHS's conduct constitutes unlawful retaliation in violation of the ADA and Section 504 of the Rehabilitation Act.

333. As a direct and proximate result of MCPHS's retaliatory conduct, Plaintiff suffered damages, including loss of economic expectancy and professional trajectory, a complete deprivation of an educational pathway, opportunity, reputational harm, and financial losses.

## *Count II: DISABILITY DISCRIMINATION & FAILURE TO ACCOMMODATE UNDER ADA & SECTION 504 OF THE REHABILITATION ACT*

334. Plaintiff realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

335.    At all relevant times, MCPHS University was a recipient of federal financial assistance and was therefore subject to Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and the implementing regulations. MCPHS was also subject to the anti-discrimination and anti-retaliation provisions of the Americans with Disabilities Act ("ADA").

336.    Plaintiff is an individual with a disability, or was regarded as having a disability, within the meaning of the ADA and Section 504, including a documented mental-health condition.

337.    MCPHS University, through its counseling services and administrative offices, had actual knowledge of Plaintiff's disability and medical status.

338.    Plaintiff requested assistance and a leave of absence related to his medical condition, and MCPHS required Plaintiff to take a medical leave of absence and imposed medical documentation requirements as a condition of return.

339.    Despite knowledge of Plaintiff's disability and medical status, MCPHS failed to engage in a documented interactive process to identify reasonable accommodations that would allow Plaintiff to continue his education.

340.    Instead of providing reasonable accommodation or engaging in an interactive process, MCPHS treated Plaintiff as a generalized "safety concern" and escalated administrative actions against him.

341.    MCPHS's actions denied Plaintiff meaningful access to its educational program and services by reason of his disability and/or perceived disability.

342.    MCPHS's conduct constituted intentional discrimination and deliberate indifference in violation of the ADA and Section 504.

343.    MCPHS failed to conduct any individualized assessment of Plaintiff's actual conduct or risk, and instead relied on generalized assumptions related to Plaintiff's disability and requests for accommodation.

344.    As a direct and proximate result of MCPHS's unlawful conduct, Plaintiff suffered economic harm, including loss of economic expectancy and professional trajectory, opportunity, loss of tuition and educational investment, impairment of career prospects, a complete deprivation of an educational pathway, and other consequential damages.

## COUNT III: RACE AND NATIONAL ORIGIN DISCRIMINATION AND RETALIATION UNDER TITLE VI OF THE CIVIL RIGHTS ACT OF 1964

345.    Plaintiff realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

346.    Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., prohibits discrimination on the basis of race, color, or national origin in any program or activity receiving federal financial assistance.

347.    MCPHS University receives federal financial assistance and is therefore subject to the requirements of Title VI.

348.    Plaintiff is of South Korean national origin and Asian race, and was subjected to harassment and a hostile educational environment on the basis of his race and/or national origin, including but not limited to derogatory racial gestures (such as students pulling at the corners of their eyes while directing the gesture toward Plaintiff), racial slurs, threatening statements referencing his ethnicity, circulation of false and defamatory rumors tied to his immigrant background, and physical intimidation.

349. Despite actual notice of the race-based harassment, MCPHS failed to take prompt and effective corrective action, dismissed complaints without explanation, and informed Plaintiff that the University could not or would not intervene in student conduct contributing to the hostile environment.

350. MCPHS's deliberate indifference to known race-based harassment created and perpetuated a hostile educational environment that denied Plaintiff equal access to the University's educational programs and activities on the basis of his race and national origin.

351. MCPHS refused to take disciplinary action against perpetrators of the racial-based harassment, and instead expelled Plaintiff.

352. Plaintiff engaged in protected activity under Title VI by opposing race-based discrimination, filing formal complaints, and filing a complaint with the U.S. Department of Education Office for Civil Rights alleging violations of federal civil rights laws.

353. MCPHS was aware of Plaintiff's protected activity, including receipt of confirmation from the Office for Civil Rights on February 19, 2025 that Plaintiff's complaint had been accepted and assigned a case number.

354. Immediately thereafter, on February 20, 2025, MCPHS issued a decision permanently separating Plaintiff from the University, followed by a cease-and-desist letter, no-trespass order, expulsion notation on his transcript, and refusal to provide procedural protections or explanatory findings.

355. The adverse actions were taken a day after Plaintiff's protected activity, were accompanied by Defendants' failure to address reported race-based harassment,

escalation of discipline shortly after Plaintiff's civil rights complaints were accepted by OCR, departure from promised procedures, refusal to provide findings or an appeal, and use of coercive measures (including a cease-and-desist/no-trespass posture), and shifting justifications including outside law enforcement referrals without justification, supporting a plausible inference that Defendants' actions were retaliatory rather than the result of neutral enforcement that constituted ongoing retaliation for opposing race-based discrimination, filing formal complaints regarding his race-based discrimination, and filing the Office for Civil Rights complaint after exhausting all internal measures.

356.    MCPHS's discriminatory and retaliatory conduct violated Title VI of the Civil Rights Act of 1964.

357.    As a direct and proximate result of MCPHS's violations of Title VI, Plaintiff suffered economic harm, loss of economic expectancy and professional trajectory, opportunity, reputational damage, a complete deprivation of an educational pathway, and other consequential damages.

## COUNT IV: VIOLATIONS OF THE MASSACHUSETTS CIVIL RIGHTS ACT (M.G.L. c. 12 §§ 11H–11I)

358.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

359.    Defendants engaged in **threats, intimidation, and coercion** that interfered with Plaintiff's secured rights, including his rights to engage in protected speech and petitioning activity, to be free from discrimination and retaliation, and to access educational programs without coercive interference.

360. Such coercive conduct was **independent of and in addition to** the underlying discriminatory and retaliatory acts, and included, among other things:

  (a) communication bans and directives prohibiting Plaintiff from contacting University officials;

  (b) issuance of cease-and-desist and no-trespass orders;

  (c) abandonment of promised disciplinary procedures and substitution of counsel-driven enforcement measures; and

  (d) **the knowing or reckless provision of false, misleading, and selectively framed information to law-enforcement authorities and other third parties**, undertaken without any individualized threat assessment.

361. These coercive acts were employed as leverage to deter and punish Plaintiff's exercise of secured rights, and were not merely the incidental consequences of ordinary disciplinary administration.

362. The law-enforcement referrals and coercive measures occurred **after expulsion had already been decided,** further supporting that the conduct was retaliatory and coercive rather than protective.

363. Defendants **knew Plaintiff was physically present in South Korea** at the relevant times and nonetheless supplied selectively framed information **despite knowing that Plaintiff posed no imminent risk**, omitting critical and exculpatory context necessary to avoid creating a misleading impression, including the expressive, political, and non-threatening nature of Plaintiff's speech and the absence of any investigative findings or threat assessments.

364. Defendants undertook this conduct **after Plaintiff engaged in protected activity**, including filing civil-rights complaints and seeking records and clarification, and did so **for the purpose of retaliating against Plaintiff, intimidating him, chilling protected speech and petitioning activity, and post-hoc legitimizing Defendants' predetermined disciplinary actions**.

365. Third parties did in fact rely on Defendants' selectively framed and misleading representations concerning Plaintiff's conduct and status.

366. As a direct and proximate result of Defendants' threats, intimidation, and coercion, Plaintiff suffered **law-enforcement contact, reputational injury, emotional distress, loss of educational and professional opportunities, and economic damages**.

367. Defendants' conduct violates the Massachusetts Civil Rights Act, and Plaintiff is entitled to injunctive relief, compensatory damages, multiple damages where applicable, attorneys' fees, and all other relief provided by law.

## COUNT V: BREACH OF CONTRACT / BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

368. Plaintiff realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

369. MCPHS University's Student Handbook, policies, tuition agreements, and published disciplinary procedures constituted a binding contract between MCPHS and Plaintiff.

370. Those materials expressly promised that any suspension or expulsion would be preceded by notice of alleged misconduct, an investigation, a conduct hearing , an opportunity to respond, written findings, and access to an appeal.

371.  Plaintiff complied with MCPHS's academic and administrative requirements and reasonably relied on these promised protections.

372.  MCPHS materially breached its contractual obligations by expelling Plaintiff without completing the promised disciplinary process, including without issuing written charges, conducting an investigation, holding a hearing, issuing findings, or providing a meaningful opportunity to respond or appeal.

373.  Defendants further breached the implied covenant of good faith and fair dealing by abandoning the disciplinary framework promised in the Student Handbook and substituting counsel-driven enforcement measures, thereby denying Plaintiff the procedural protections guaranteed to students and rendering the promised disciplinary process illusory.

374.  MCPHS further breached the implied covenant of good faith and fair dealing by abandoning its disciplinary framework and exercising its authority arbitrarily, selectively, and in bad faith, rendering the promised procedures illusory.

375.  As a direct and proximate result of these breaches, Plaintiff suffered loss of tuition, loss of economic and professional expectancy, reputational harm, and substantial economic damages.

## *COUNT VI: UNFAIR AND DECEPTIVE BUSINESS PRACTICES UNDER MASSACHUSETTS GENERAL LAWS CHAPTER 93A*

376.  Plaintiff realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

377.  MCPHS University was engaged in trade or commerce within the meaning of Massachusetts General Laws Chapter 93A, § 2, including the provision of higher-education services in exchange for tuition and fees.

378.  MCPHS engaged in unfair and deceptive acts or practices by, among other things:

- Marketing and representing strong post-graduation outcomes and a reliable pathway to employment while failing to disclose material risks and barriers relevant to Plaintiff's enrollment decision;

- Acting through a dual-role agent (Judy Do) who stood in a position of trust with Plaintiff, without disclosing or obtaining informed consent to conflicts of interest inherent in her simultaneous roles as Plaintiff's guardian and MCPHS representative;

- Misrepresenting or failing to disclose the limited availability of institutional academic support resources, including tutoring, which Plaintiff reasonably relied upon in deciding to enroll and continue in the program.

- Using outcome-based assurances and relationship-based influence to induce Plaintiff's enrollment and continued tuition payments under tainted consent;

- Misrepresenting or failing to disclose material facts regarding the procedures and safeguards that would be applied in disciplinary matters resulting in severe sanctions;

- Expelling Plaintiff and placing an expulsion notation without adherence to promised procedures and without providing the investigative or disciplinary basis for the action; and

- Proposing resolution conditioned on Plaintiff's silence and deletion of public statements.

379.  MCPHS's conduct was unfair, deceptive, and unscrupulous, and violated established concepts of fairness and public policy.

380. Plaintiff sent a written demand for relief pursuant to Chapter 93A, § 9, to which MCPHS failed to make a reasonable written offer of settlement.

381. MCPHS did not provide a written tender within the statutory period.

382. MCPHS's violations of Chapter 93A were knowing and willful.

383. The challenged conduct is distinct from academic judgment and arises from commercial recruitment, marketing, tuition retention, and disciplinary practices undertaken in trade or commerce.

384. As a direct and proximate result of MCPHS's unfair and deceptive acts, Plaintiff suffered ascertainable losses, including $200,000 of tuition loss, over $180,000 of living expenses including rent and food, lost job offers from alumni, complete educational derailment, impaired career prospects, and other economic damages.

385. The challenged conduct includes recruitment marketing, outcome representations, and tuition-for-services transactions directed at inducing enrollment and continued payment, constituting trade or commerce under Chapter 93A.

### COUNT VII: BREACH OF FIDUCIARY DUTY

386. Plaintiff realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

387. This fiduciary relationship is distinct from an ordinary student-university relationship and arises from Defendants' exploitation of Ms. Do's long-term guardianship and advisory role to induce enrollment and continued tuition payments.

388. Defendants, through their agent Judy Do, stood in a fiduciary and fiduciary-like relationship to Plaintiff, arising from long-term guardianship, counseling, and Plaintiff's dependence on Defendants' guidance in making major life and financial decisions.

389.   At no time did Defendants disclose or obtain informed consent to the conflicts of interest inherent in Ms. Do's simultaneous roles as Plaintiff's guardian and MCPHS representative.

390.   Defendants breached their fiduciary duties by subordinating Plaintiff's interests to institutional interests, providing misleading reassurances without reasonable basis, and failing to disclose material risks related to program completion and post-graduation outcomes. As a direct and proximate result, Plaintiff suffered substantial financial, educational, and professional harm.

391.   As a result of Defendants' breaches of fiduciary duty, Defendants were unjustly enriched by tuition, fees, and related payments obtained through misleading inducement and tainted consent.

392.   **Plaintiff therefore suffered substantial damages**, including loss of tuition and educational investment, deprivation of informed consent in entering and continuing the enrollment relationship, reliance-based financial losses, and foreseeable economic harm caused by Defendants' breach of fiduciary duty.

### *COUNT VIII: PROMISSORY ESTOPPEL (Pled in the Alternative)*

393.   Plaintiff realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

394.   Defendants, through their agent Judy Do, made clear and specific representations to Plaintiff regarding post-graduation employment outcomes, including that she had "never seen someone not get a job after graduation," in response to Plaintiff's direct inquiry concerning the viability of employment following completion of Defendant's program.

395.    At the time these representations were made, Ms. Do served both as Plaintiff's legal

guardian for approximately ten years and as a counselor and Special Agreements

Coordinator for Defendant MCPHS, and Defendants knew or reasonably should have

known that Plaintiff would rely on such assurances in deciding whether to enroll in and

continue in the program.

396.    Plaintiff reasonably and foreseeably relied on these representations in enrolling in

Defendant's program, committing substantial tuition payments, foregoing alternative

educational and professional opportunities, and investing significant time and effort in

reliance on the promised pathway.

397.    Plaintiff's reliance was reasonable given Ms. Do's fiduciary role, advisory authority, and

Defendants' superior access to information regarding actual program outcomes and

risks.

398.    Defendants subsequently failed to honor the assurances that induced Plaintiff's reliance,

and Plaintiff suffered substantial financial and educational harm as a result.

399.    Injustice can be avoided only by enforcement of Defendants' promises to the extent

necessary to remedy Plaintiff's reliance, and Plaintiff therefore seeks appropriate

equitable relief, including reliance-based restitution and other relief deemed just and

proper by the Court to the extent necessary to remedy Plaintiff's reliance, and not as a

guarantee of future employment.

## COUNT IX: INTENTIONAL INTERFERENCE WITH ADVANTAGEOUS RELATIONS BY IMPROPER MEANS

400.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set

forth herein.

401.  Plaintiff had existing and reasonably expected advantageous relationships and opportunities, including transfer prospects, faculty recommendations, alumni connections, job offers from alumni, and professional advancement opportunities.

402.  Defendants knew of these relationships and expectations.

403.  Through improper means, including retaliatory escalation, communication restrictions, and external referrals that tainted Plaintiff's standing, Defendants intentionally interfered with Plaintiff's advantageous relations.

404.  Defendants' conduct was motivated by retaliation and was not justified by any legitimate institutional purpose.

405.  As a direct and proximate result of Defendants' interference, Plaintiff suffered loss of advantageous relations and opportunities, including transfer prospects, faculty recommendations, alumni connections, employment opportunities, and associated economic damages.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court enter judgment in his favor and award the following relief:

406.  Defendants were unjustly enriched by tuition, fees, and related payments obtained through breaches of fiduciary duty and misleading inducement. Plaintiff seeks disgorgement of all revenues obtained as a result of Defendants' wrongful conduct, regardless of whether such amounts exceed traditional contract damages.

407.  Plaintiff's consent to enroll and continue in Defendant's program was procured through breaches of fiduciary duty and material misrepresentations. Plaintiff therefore seeks

rescission of the enrollment agreement and equitable restitution restoring Plaintiff to the position he occupied prior to Defendants' misconduct, including reimbursement of tuition, fees, and reliance expenditures.

408.    Narrowly tailored injunctive relief restoring Plaintiff's eligibility to continue or complete his program **subject to neutral, published academic standards and procedures**, and correcting records to remove disciplinary notations entered without the promised process.

409.    Compensatory damages in an amount to be determined at trial;

410.    Consequential damages in an amount to be determined at trial;

411.    Declaratory relief stating that Defendants' conduct violated fiduciary duties, consumer protection statutes, and Plaintiff's rights under Defendants' own policies, and that Defendants' representations regarding outcomes were misleading and improper.

412.    An order granting appropriate equitable relief, including narrowly tailored injunctive relief correcting Plaintiff's academic and disciplinary records and prohibiting Defendants from relying on misleading representations as applied to Plaintiff.

413.    An award of costs and such other relief as the Court deems just and proper, including attorneys' fees if incurred pursuant to M.G.L. c. 93A § 9 and applicable federal statutes;

414.    Multiple damages under Chapter 93A due to willful and knowing violations;

***********************************************************************

## PLAINTIFF DEMANDS A TRIAL BY JURY

Respectfully submitted,

Jaehyun Kim
Pro se Plaintiff
815 E St, PO Box #12214
San Diego, CA, 92112
857 381 3352
jaehyunkim720@gmail.com