UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JAEHYUN KIM,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>MASSACHUSETTS COLLEGE OF<br>PHARMACY AND HEALTH SCIENCES, and<br>JOHN DOES 1-10,<br><br>　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION<br>No. 25-cv-13928-WGY |

YOUNG, D.J.                                April 23, 2026

## FINDINGS OF FACT, RULINGS OF LAW, ORDERS ON PENDING MOTIONS, AND ORDER FOR JUDGMENT

After a jury-waived trial, for the reasons stated at trial and set forth herein, judgment shall enter in favor of the defendant Massachusetts College of Pharmacy and Health Sciences ("MCPHS"), and against the Plaintiff, Jaehyun Kim ("Kim"), proceeding pro se.  Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court provides its findings of fact, rulings of law, and order for judgment.  The Court also addresses the remaining pending motions and certain statements and notices filed by Kim.

## I. INTRODUCTION

This is an action by a former pharmacy student, Kim, against MCPHS,[1] for its alleged discrimination and dismissal of Kim from its pharmacy program.  See generally, First Am. Compl. ("Am. Compl."), ECF No. 7.

On **January 27, 2026**, Kim sought "emergency injunctive relief" in the form of a "temporary restraining order and preliminary injunction."  TRO and Prelim. Inj. ("Mot. TRO and Prelim. Inj."), ECF No. 17.

On **January 29, 2026**, the Court held an expedited hearing on the motion, and per its usual practice collapsed the matter for trial pursuant to Rule 65(a) of the Federal Rules of Civil Procedure.  See Elec. Clerk's Notes, ECF No. 25; Jan. 29, 2026 Prelim. Inj. Hr'g Tr. ("Jan. 29, 2026 Hr'g Tr.") 4:25-5:1-5, ECF No. 106.  At that hearing, pursuant to Rule 39(a) of the Federal Rules of Civil Procedure, the parties waived a jury trial in this case, and consented to trial before the Court.  See Jan. 29, 2026 Hr'g Tr. 6:15-25-7:1-5.  Inasmuch as Kim is proceeding pro se, the Court -- also as its usual practice -- inquired as to whether Kim intended to be represented by counsel; Kim

---

[1] The "John Doe 1-10 Defendants," having not been served, and identified only as "individuals employed by or acting as agents of" MCPHS, are dismissed from this action.  See Fed. R. Civ. P. 4(m).

[2]

responded in the negative due to "ongoing financial constraints."  Id. at 4:3-19.

The Court discussed scheduling, and Kim sought an expedited trial date.  Id. 5:6-10; 6:7-8:3.  The Court then outlined the trial process and answered general questions, including the option to subpoena witnesses.  Kim was issued trial subpoenas that same day.

On **February 4, 2026**, the jury-waived trial commenced, with four witnesses, including Kim, and the admission of 21 exhibits, after which Kim rested, and asked whether he might be permitted to submit one more exhibit the next day, which was denied without prejudice.  Prelim. Inj./Evid. Hr'g Tr. ("Feb. 4, 2026 Jan. 29. 2026 Trial Tr.") 166:16-25, ECF No. 107.  Notably, Kim made no objections as to the state of the record, the need for additional documentary or testimonial evidence (or non-compliance with subpoenas).  MCPHS made an oral motion for judgment.  The Court informed the parties that it would entertain the motion the next day, and adjourned.

On **February 5, 2026,** after hearing the parties, the Court made preliminary findings on the record, and dismissed Counts I, II, IV, V, VI, VII, VIII and IX upon MPCH's oral motion for judgment on partial findings.  See Electronic Clerk's Notes, ECF No. 86.  The Court took the remaining count -- Count III -- under advisement.  Id.

[3]

Kim claimed during argument that he "didn't get a chance to actually go through discovery" with respect to obtaining certain records.  Prelim. Inj./Evid. Hr'g Tr. (Continued.) ("Feb. 5, 2026 Trial Tr.") 8:7-8, ECF No. 108.  The Court reminded Kim that he "had the right to subpoena witnesses, the issue of subpoena was raised."  Id. at 8:9-11.

MCPHS elected not to enter any evidence and rested.  See Elec. Clerk's Notes, ECF No. 86.  The parties presented their closing arguments, the Court commended the parties for presenting their cases to this Court civilly and professionally, and took the matter under advisement.  See Feb. 5, 2026 Trial Tr. 24:25-25:1-16.  The parties have submitted their respective proposed findings of fact and rulings of law.  See ECF Nos. 79, 80, 83, 85.  The Court permitted Kim to submit three post-trial exhibits consisting of police reports and a criminal complaint. Kim filed multiple post-trial motions, statements and notices, those of which that are pending as of this date are addressed in part IV.  See infra.

## II.    FINDINGS OF FACT

### A.    The Court's Duty to Weigh the Evidence, Assess the Credibility of the Witnesses, and Find Facts in this Trial

Though this Court is unashamedly a champion of juries and jury trials,[2] as here -- in a non-jury trial or bench trial -- the Court takes on the role of the fact-finder, and "[w]hen facts are in dispute the [C]ourt weighs the evidence and makes findings of credibility." Wigfall v. Shea, 744 F. Supp. 3d 115,

---

[2]  As this Court has written on the subject of jury trials:

> We did not invent it but it is here — in the United States of America — that it has come into full flower.  It ought come as no surprise that nearly all of the civil jury trials on the planet take place here — in the United States.  United States v. Luisi, 568 F. Supp. 2d 106, 110 (D. Mass. 2008) (quoting Hon. William G. Young, Vanishing Trials, Vanishing Juries, Vanishing Constitution, 40 SUFFOLK U.L. REV. 67, 68 (2006) ("Nearly all civil jury trials and ninety percent of criminal jury trials on the planet take place in the United States.").  Any attempt to marginalize the role of the jury in American life is as direct an assault on our democracy as an attempt to impair our right to vote. See Andrews-Clarke v. Travelers Ins. Co., 984 F. Supp. 49, 63 n. 74 (D. Mass. 1997).

> Make no mistake. Where a jury sits there burns the lamp of liberty.  Every single jury trial, every one — whether in state or federal court — is both a test and a celebration of a free people governing themselves.

Vermont Mut. Ins. Co. v. Toland, No. CV 19-12545-WGY, 2022 WL 4481508, at *7 n. 4 (D. Mass. Sept. 27, 2022).

118 (D. Mass. 2024) (Woodlock, J.) (quoting <u>Woodman</u> v. <u>United States</u>, 602 F. Supp. 3d 265, 271 (D.N.H. 2022)).  In its role as fact-finder, this Court has the duty and broad discretion to assess credibility and attach weight to evidence.[3]  As the First

---

[3] As this Court has written on the subject of judicial fact-finding:

> [F]act finding . . . requires the utmost fairness and impartiality:
>
> > [F]act-finding is difficult. Exacting and time consuming, it inevitably falls short of absolute certainty. More than any society in history, the United States entrusts fact-finding to the collective wisdom of the community. Our insistence on procedural safeguards, application of evidence rules, and our willingness to innovate are all designed to enhance impartial fact-finding.
> >
> > Judicial fact-finding is equally rigorous. Necessarily detailed, judicial fact-finding must draw logical inferences from the record, and, after lucidly presenting the subsidiary facts, must apply the legal framework in a transparent written or oral analysis that leads to a relevant conclusion. Such fact-finding is among the most difficult of judicial tasks. It is tedious and demanding, requiring the entirety of the judge's attention, all her powers of observation, organization, and recall, and every ounce of analytic common sense he possesses. Moreover, fact-finding is the one judicial duty that may never be delegated to law clerks or court staff. Indeed, unlike legal analysis, many judges will not even discuss fact-finding with staff, lest the resulting conclusions morph into judgment by committee rather than the personal judgment of the duly constituted judicial officer.

Circuit plainly puts it, unless clearly erroneous, see Fed. R. Civ. P. 52(a)(6), "in a bench trial, credibility calls are for the trier." Alaniz v. Bay Promo, LLC, 143 F.4th 18, 34 (1st Cir. 2025) (quoting Morgan-Lee v. Therapy Res. Mgmt. LLC, 129 F.4th 93, 98 (1st Cir. 2025)). This includes, as here, the weighing of conflicting testimony. Id. "A corollary of this proposition is that, when there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Johnson v. Watts Regulator Co., 63 F.3d 1129, 1138 (1st Cir. 1995).

### 1. Kim's Credibility

This Court had the opportunity to observe directly Kim in both his capacity as a self-advocate and as a witness in this case. The Court is impressed with Kim's presentation of his case as a self-advocate without legal training. With a single exception, Kim has acted with the civility and professionalism

---

Hon. William G. Young, A Lament for What Was Once and Yet Can Be, 32 B.C. INT'L & COMP. L. REV. 305, 312-13 (2009). The path to fact finding leads through trial. See In re One Star Class Sloop Sailboat Built in 1930 with Hull No. 721, Named "Flash II", 517 F. Supp. 2d 546, 556 (D. Mass. 2007) ("As is always the case, issues yield readily to fact finding."), aff'd sub nom. United States v. One Star Class Sloop Sailboat built in 1930 with hull no. 721, named "Flash II", 546 F.3d 26 (1st Cir. 2008).

Sellers v. Trustees of Boston College, 729 F. Supp. 3d 136, 192 (D. Mass. 2024).

[7]

that this Court expects of all parties.  See Feb 4, 2026 Trial Tr. 65:17-23.  The Court neither doubts the sincerity with which Kim believes in his claims, nor in Kim's belief in his testimony to the Court.

That being said, Kim's credibility as to his substantive claims is greatly diminished by the record evidence of his consistent combative and threatening conduct throughout the relevant time period and leading up to his filing of this action.  While Kim certainly had the **right** to contest the actions of MCPHS, it is evident from the entirety of the evidentiary record that he is quick to resort to ad hominem attacks.  He mocks, threatens, and harasses those who do not agree with him.  To be sure, there is evidence in the record that Kim has "adjustment disorder" and was diagnosed with "Bipolar II" disorder.  Feb. 4, 2026 Trial Tr. 42:10-20.  The Court is, of course, sympathetic to Kim's apparent mental disorders and applauds his seeking treatment.  The Court need not -- and does not -- make credibility determinations based upon his purported diagnoses.  Rather, Kim's purported diagnoses of mental disorders are an essential element of some of his claims, so it is considered for that purpose only.  While his diagnoses may, or may not, explain some or all of Kim's conduct, it does not excuse it, and as here, is irrelevant to the Court's

[8]

analysis because Kim's **objective** conduct is what ultimately resulted in his dismissal from MCPHS.

### 2. MCPHS Administration Witnesses' Credibility

The Court also had the opportunity to directly observe three MCPHS administration witnesses called by Kim. The Court finds that each and all of these witnesses were credible, thoughtful and responsive in their testimony before this Court.

### B.    The Student Handbook and Relevant Provisions

MCPHS, like most if not all universities, has a student handbook. Relevant to this action, as agreed by the parties, is the 2024-2025 MCPHS Student Handbook. See 2024-2025 Student Handbook ("Student Handbook"), Ex. 1. The Student Handbook expressly disclaims that it is a contract or creates a contractual relationship with students, such as Kim. Student Handbook at 1. The Handbook sets forth procedures to claim disabilities under the Rehabilitation Act and the Americans with Disabilities Act, directing student to contact MCPHS's Office of Student Access and Accommodation ("OSAA"). Id. at 48-49. The Student Handbook also contains the Student Code of Conduct, and its procedures. Id.[4]

---

[4] While in his testimony Kim seems to question ever receiving a Student Handbook, see Feb. 4, 2026 Trial Tr. 6:5-15; 36:4-22, in one of the emails Kim offered as part of Exhibit 21, Kim states that he "reviewed the student handbook." September 24, 2024 4:23 PM email from Kim to Dean Andreucci, Ex. 21.

[9]

### C.    Kim Matriculates to the MPCHS in March 2021

In March of 2021, Kim, who is a citizen of South Korea, enrolled in the Doctor of Pharmacy Program at MCPHS. Feb. 4, 2026 Trial Tr. 14:18-19. He applied based, in part, upon the encouragement of Heacok "Judy" Do ("Do"), who acted as his guardian in the United States since he was nine years old. Kim testified that he viewed Do similar to a parent. Id. at 14:24-15:7. Do is also a contracted agent to promote MCPHS.[5] She was not called as a witness.

### D.    September 2021 – July 2024: Kim's Troubled Tenure at MCPHS.

Kim has been involved in several alleged incidents while at MCPHS spanning from September 2021 through his taking his first medical leave of absence in the Spring of 2024.

Kim testified that beginning in 2021, he reported incidents of student misconduct to MCPHS administrators such "as racially charged harassment, threatening language, and physical intimidation." Feb. 4, 2026 Trial Tr. 15:22-23. Kim also claims that he requested mediation in a student organization dispute but was denied. Id. at 16:13-15.

---

[5] That agreement expressly disavows any relationship other than an independent contractor of MCPHS. See Agreement for Services for Do, Ex. 11.

Kim testified that in July 2023, he filed a formal incident report against an MCPHS Public Safety officer for misconduct, but that no disciplinary action was taken against the MPCH Public Safety Officer. Id. 16:11-13; see also Summer 2023 Public Safety Incident Report, Ex. 9.

In September 2023, Kim was issued a letter restraining his ability to attend certain events and his involvement in student organizations, and also requiring him to refrain from contact with an MCPHS faculty member due to Kim's conduct. File from Student Affairs Office, Ex. 19, MCPHS 000059.[6] An Administrative Conference followed, where Kim accepted responsibility for violating the Student Code of Conduct and agreed to the sanctions provided. See id. MCPHS 000060-61. Kim apparently later disputed the voluntariness of his acceptance of responsibility. See Sep. 24, 2024 9:11 PM email from Kim to Dean Andreucci, Ex. 21.

In February 2024, Kim filed a complaint with MCPHS Public Safety concerning a fellow student purportedly sharing inappropriate photographs of another student. See Feb. 4, 2026 Trial Tr. 46:9-47.

Kim testified that sometime in July 2024, while on his first medical leave, see infra, he checked on the status of his

---

[6] References to "MCPHS 000__" herein are document identification numbers on the exhibit.

[11]

February report, at which time he stated that his motivation for making the report was that the other student had made racist gestures towards him.  Feb. 4, 2026 Trial Tr. 47:4-22.  This is the first time Kim made a claim of racial discrimination, and he was later informed that this complaint had been dismissed.  Id. at 48:12-49:3.

Carl Oliveri, Jr., Senior Associate Dean of Students, ("Dean Oliveri") testified that there were two occasions on which he went to Public Safety concerning Kim during this time period.  Id. at 125:9.  The first was a 2023 incident where Kim reported a student had discussed the ability to poison individuals.  Id. at 125:12-18.  The second incident concerned complaints about "actions and comments made by a particular student"[7] as well as the July 2024 purported explicit picture of a third person.  Id. at 126:1-12.

## E.    Spring 2024 - Kim's First Medical Leave of Absence

Dean Oliveri testified as to two voluntary leaves of absence taken by Kim back-to-back: the Spring of 2024 and the Fall of 2024.  Id. at 126:23-127:2.  Dean Oliveri facilitated

---

[7] Dean Oliveri seemed to be referring to the alleged racist gestures mentioned above.  That incident (which supposedly happened in the Spring 2022) and several other instances of conflicts between Kim and other students were later referred to by Kim in his formal complaint to MCPHS from Sep. 24, 2024. Feb. 4, 2026 Trial Tr. 124:8-24, 125:3-6; see generally, Formal Complaint, Ex. 7.

[12]

both of them.  Id. at 127:1-2.  Dean Oliveri explained that one of his roles was to work with students that needed to take leaves of absence because of medical reasons.  Id. at 127:4-6. He described the process as an "exit meeting."  Id. at 127:10-11.  The meeting was with counseling services, Oliveri, and the student and then to put the student on leave.  Id. at 127:11-14. Kim testified that in the Spring of 2024, due to "deteriorating health," he requested a medical leave of absence.  Id. at 16:20-24.

### F.  August 2024 - Kim Returns from First Medical Leave of Absence

In August 2024, Kim returned from his first medical leave. Feb. 4, 2026 Trial Tr. 16:25, 17:1-2, 127:14-24.  Oliveri testified that there is a required "reeentry meeting" to ensure that the student, with Counseling Services, recommendation is cleared to resume classes.  Id. at 127:14-20.  Oliveri then would ensure that Kim was registered for classes.  That meeting occurred in August 2024 just before classes began.  Id. at 127:21-24.  Kim was cleared medically to return from his leave of absence and begin classes in the Fall of 2024.  Id. at 128:2-5.

Kim testified that he returned in the Fall 2024, but claims that he was questioned and "treated as a problem rather than a student . . . seeking support."  Id. at 16:25-17:6.

Nevertheless, Kim testified that he returned from his medical leave of absence and was performing well. Id. at 17:7-9.

> **G.    September 2024 - Kim's Ejection from the Colleges of the Fenway's Fantasy Football League Prompts Disciplinary Process at MCPHS.**
>
> >    1. **Kim Participates in COF Fantasy Football League and is Ejected For Profanity in the League Chatroom**

In August 2024, Kim participated in a fantasy football league[8] sponsored and monitored by a student recreational consortium, Colleges of the Fenway ("COF"). See Feb. 4, 2026 Trial Tr. 50:6-13. In **September 2024,** during Kim's participation in the league he messaged others in a league chat. Some of those messages he characterized as "jokes," but contained profane content that violated COF's Code of Conduct. Id. at 17:9-12, 51:7; see also Ex. 12. One posting included:

> [REDACTED STUDENT IN LEAGUE] will have a sister in 9 months. Mark my words. This [expletive] also has zero highlights on Hudl . . . and he won't ask his mom if I can [expletive] her, . . . please reply so that I have a yes or no by the time I nut six feet inside her.

Ex. 19, MCPHS 000021.[9]

---

[8] Fantasy football is a game where participants select NFL players to their respective "teams," usually in a draft selection system. The fantasy teams rely on individual statistics to assign points. The fantasy teams then "play" each other each week. The team with the most statistical points for that week "wins" the game.

[9] Kim does not contest that he made this and other statements. Tr. 55:3-7.

A COF fantasy football league monitor flagged the statement, informed Kim that these messages were inappropriate, and that further inappropriate messages would result in his ejection from the league.  See Ex. 19, MCPHS 000015-19.

Kim claims that the student referred to in the message later sent Kim a message that he did not take offense to what was said.  Feb. 4, 2026 Trial Tr. 17:17-21, see also Ex. 2. While Kim further stated that it was merely a "joke," and believed that the COF monitor was "just a supervisor . . . running his mouth", id. at 51:15-16, the COF Handbook clearly states "[v]ulgar, obscene, abusive derogatory and demeaning comments . . . are not permitted."  COF Handbook, Ex. 19, MCPHS 000088.  Similarly, unsportsmanlike behavior, including "[u]sing profane inappropriate, insulting, or vulgar language" is prohibited under the COF Code of Conduct.  Id.  Although Kim minimizes his conduct now, when confronted, Kim also challenged the monitor, disputing that he did anything wrong and that others engaged in similar conduct.  See Ex. 19, MCPHS 000013-14. While the Court credits that Kim may have intended his comments as jokes, his comments -- and his aggressive response to the COF monitors when confronted -- fall well within the plain meaning of conduct that violates the COF Code of Conduct.

Kim then posted in a later post:

> Whoever vetoes these trades is a communist . . . . You all worship Mao Zedong Kim Jong Un and Stalin . . . Absolute commie bastards . . . kick me [expletive].

Id. MCPHS 000026.

On **September 23, 2024,** Kim was ejected from the COF Fantasy Football League, and a complaint was filed by the COF with MCPHS.  See Ex. 19, MCPHS 000012.

### 2. Kim Referred to Level I Hearing For Fantasy Football Incident

On **September 24, 2024,** at 1:00 pm, MCPHS, through Assistant Dean of Students A.J. Andreucci ("Dean Andreucci"), sent an email to Kim notifying him of the complaint, and that a "Level I" student conduct hearing was scheduled.[10]  Sep. 24, 2024 1:00 PM email from Dean Andreucci to Kim, Ex. 21.  Kim sought a delay to consult his lawyers and because of an exam.  See Sep. 24, 2024 1:51 PM email from Kim to Dean Andreucci, Ex. 21.  Dean Andreucci, who had been involved with some of Kim's prior campus issues, responded that, as per the handbook, attorneys were not permitted in disciplinary proceedings, but presuming the information was correct, a postponement until September 30, 2024, would be permitted.  See Sep. 24, 2024 2:23 PM email from Dean Andreucci to Kim, Ex. 21.

---

[10] "Level I" disciplinary matters "do not involve suspension or expulsion as possible sanctions."  Student Handbook at 78.

[16]

Kim responded seeking a hearing advisor, and appeals information, which was provided. See Sep. 24, 2024 3:21 PM email from Kim to Dean Andreucci, Ex. 21. Kim then sought information about who was complaining. See Sep. 24, 2024 4:23 PM email from Kim to Dean Andreucci, Ex. 21. Kim was informed that the complaint came from COF staff members, see Sep. 24, 2024 4:30 PM email from Dean Andreucci to Kim, Ex. 21, upon which Kim responded that he wished to bring a "counter complaint," specifically against "Anthony Andrews, for an abuse of power and overreach of his duties along with discrimination against free speech rights with an immediate call for termination and resignation." Sep. 24, 2024 4:48 PM email from Kim to Dean Andreucci, Ex. 21.

Ten minutes later, Kim requested that Dean Andreucci remove himself because of "acrimonious relations in the past." Sep. 24, 2024 4:59 PM email from Kim to Dean Andreucci, Ex. 21. Later that evening Kim sent an email deriding Dean Andreucci for allegedly abusing his power because he did not provide details of the complaint. Sep. 24, 2024 9:11 PM email from Kim to Dean Andreucci, Ex. 21. Kim referenced the resolution of an earlier incident in Dean Andreucci's office, and attributed his need to take the earlier mental health leave of absence due to it. Id. Approximately ten minutes later, Kim sent another email complaining about the lack of detail, calling the proceedings a

[17]

"kangaroo court." Sep. 24, 2024 9:22 PM email from Kim to Dean Andreucci, Ex. 21. Kim, again, urged Dean Andreucci to remove himself from the investigation and shut the investigation down. Id.

Kim testified that on that same day he "made a formal complaint to the Student Affairs team of [MCPHS] . . . " Feb. 4, 2026 Trial Tr. 59:8-9; see also Formal Complaint, Ex. 7.

> **H.    September 2024 - MCPHS Receives Harassment Claim Against Kim by a Fellow Student while the Level I Hearing Pending, and the Complaints are Combined into a Level II Hearing**

On **September 25, 2024,** Dean Oliveri met with a student who claimed that Kim had been sending him harassing texts. See Feb. 4, 2026 Trial Tr. 131:3-12, 132:15-19; Ex. 19, MCPHS 000029. Although Oliveri originally testified that there were three instances where the student told Kim to leave him alone, see Feb. 4, 2026 Trial Tr. 131:23-25, 132:1-7; see also Ex. 19, MCPHS 000046 ("[Kim], this the third time I am telling you to not contact me today."), Oliveri later testified it appeared to be twice. See Feb. 4, 2026 Trial Tr. 140:1-2. Dean Oliveri reported this matter to Dean Andreucci, "and the Dean of Students Office combined the two situations into one hearing." Id. at 131:17-20.

On **September 26, 2024,** Dean Andreucci informed Kim that the matter had been reassigned to a different hearing officer and

[18]

that an updated hearing notification letter would be forthcoming. Sep. 26, 2024 12:20 AM email from Dean Andreucci to Kim, Ex. 21. He also provided a link to coordinate time to review the reports in the matter. Id.

At some point, Associate Dean of Students Hillary Theofane ("Dean Theofane") thereafter contacted Kim (though the email is not in the record), and Kim responded, questioning her "jurisdiction in Boston," as she is a dean out of the Worcester campus. See Sep. 26, 2024 9:47 AM email from Kim to Dean Theofane, Ex. 21. Kim referenced unidentified lawyers claiming a "breach in policy, and procedure" and that "[s]omeone from the Boston campus must respond." Id.

Dean Theofane responded, informing Kim that all deans have authority to adjudicate cases under the Student Code of Conduct. Sep. 26, 2024 10:03 AM email from Dean Theofane to Kim, Ex. 21.

Kim responded, complaining about the "irregularity" of the procedure, that his efforts to respond were cutting into his study time, and that he had an important examination. Sep. 26, 2024 10:25 AM email from Kim to Dean Theofane, Ex. 21. He also claimed that there had been multiple violations of his rights, not just in the instant matter. Id. He sought dismissal of the claim based upon "improper procedure and blatant disregard for [Kim's] own rights as a student . . . ," concluding the matter

was a "witch hunt" and an act of "targeting and violence" against him.  Id.

On **September 30, 2024,** Dean Theofane notified Kim that the Level I hearing would not occur that day, and that Dean Oliveri would reach out with next steps.  Sep. 30, 2024 10:30 AM email from Dean Theofane to Kim, Ex. 21.

Dean Oliveri did, in fact, reach out to Kim to volunteer to be Kim's advisor because of their relationship, and to let him know that the Level I Hearing was being transitioned to a Level II Hearing.[11]  Feb 4. 2026 Trial Tr. 138:18-22.  Dean Oliveri testified that he wanted Kim to hear it from him because of their relationship.  According to Dean Oliveri, Kim expressed his appreciation.  Id. at 138.  Dean Oliveri recalled that he told Kim that the decision to escalate was not his, because based upon their prior relationship he "took [himself] out of the equation."  Id. at 142:8-10.  The Court credits this testimony.

I.   **Kim is Issued No-Contact Order and Level II Hearing Scheduled for COF Fantasy Football Issue and Harassment Claim**

On **October 2, 2024,** MCPHS issued a "no contact" order to Kim, see No Contact Order, Ex. 19, MCPHS 000010, with respect to the harassment allegations concerning the student.

---

[11]  Level II Hearings "involve the possible sanction of suspension or expulsion."  See Student Handbook at 78.

[20]

On **October 3, 2024,** Dean Theofane sent a letter (dated October 2, 2024) via an email to Kim concerning the scheduling of the Level II Hearing concerning the COF Fantasy Football League incident and the harassment allegations of the student, outlining the purported violations of the Code of Conduct.  See Oct. 2, 2024 letter from Dean Theofane to Kim, Ex. 19, MCPHS 000002; Oct. 3, 2024 10:00 AM email from Dean Theofane to Kim, Ex. 21.

### J.    Kim Takes Leave of Absence to Avoid Disciplinary Hearing, and Notified about Contacting Faculty

Kim testified that he met with Dean Oliveri on or around **October 3, 2024**.  Feb. 4, 2026 Trial Tr. 19:6-8.  Kim testified that Dean Oliveri presented him with two options: take a Leave of Absence or proceed with a Level II hearing, and that he was told that he needed help.  Id. at 19:8-16.  According to Kim, Dean Oliveri told him that the leave would be medical, that he needed help, and he should leave the reasons for the leave blank.  Id. at 19:13-16.  Kim testified that "based on the information provided [to him] at that time, the only concrete option [he] understood was to take the leave of absence."  Id. at 19:17-29.  Kim testified that he took the leave of absence and returned to South Korea.  Id. at 19:19-20.

Dean Oliveri testified about this same meeting, that on **October 3, 2024** he met with Kim.  Id. at 128:8-14.  He was

[21]

serving as Kim's adviser at the Level II Hearing and to help him prepare as an impartial guide to Kim.[12] Id. at 128:14-19. While the purpose of the meeting was to prepare for the Level II hearing, Kim asked if it would be possible to take leave and what that would mean for his status at MCPHS. Id. at 128:20-25. Dean Oliveri responded that if Kim did take voluntary leave the hearing would be paused until Kim was ready to return. Id. at 129:3-8. Upon his filing of the paperwork to return, the disciplinary process would need to be concluded before he could fully return. Id. at 129:8-12.

Kim's voluntary medical leave of absence was initiated on October 3, 2024. Trial Tr. 128:6-9; 152:6-8. Kim then sought restitution from Financial Services. Id. at 152:6-16. Over the weekend, October 4 or October 5, 2024, Dean Oliveri recalls informing Kim that upon processing the leave, it cannot be rescinded without approval from the Registrar of Student Financial Services. Id. at 153:10-17.

---

[12] One might question the wisdom of Dean Oliveri acting as an impartial advisor when it was he who took the complaint of the alleged harassment victim that ratcheted the hearing to a Level II proceeding. The Court is persuaded that Dean Oliveri was at all times acting in good faith and motivated by compassion. There is evidence that Kim trusted Dean Oliveri in September 2024. See Formal Complaint at 4 (noting Kim being "suspicious of the entire Student Affairs and the entire team," but excepting Dean Oliveri as "represent[ing] the best of human nature"). Under the circumstances, and because of their prior relationship of trust, he remained a logical person to reach out to Kim. See Trial Tr. 138:13-139:1.

[22]

Even though he had initiated his leave of absence, apparently believing he could rescind his leave, on **October 4, 2024,** Kim sent an email to Dean Theofane, apologizing if he "came off as confrontational" and for "being so aggressive." Oct. 4, 2024 11:31 AM email from Kim to Dean Theofane, Ex. 21. Kim then sought to determine whether he could introduce evidence of threats and misconduct against the other student-complainant. Id.; see also Oct. 4, 2024 12:29 PM email from Kim to Dean Theofane, Ex. 21.

Dean Theofane responded to Kim, inviting him to provide any information that he intended for the hearing officers to review in a single document, and sought information to register the witness that Kim sought to call on his own behalf. See Oct. 4, 2024 2:10 PM email from Dean Theofane to Kim, Ex. 21.

There is testimony that outside counsel, Timothy Fazio, was notified at this point by Dean Oliveri. Feb. 4, 2026 Trial Tr. 161:3-18.

On **October 6, 2024,** Kim followed up with Dean Theofane, indicating two witnesses he intended to call, as well as a proposed statement to the hearing officers. See Oct. 6, 2024 6:39 AM email from Kim to Dean Theofane, Ex. 21.

On **October 8, 2024,** MCPHS, by letter (sent electronically), cancelled the October 9, 2024 hearing, upon confirmation that Kim was no longer an active student at MCPHS. See Oct. 8 2024

[23]

letter from Dean Theofane to Kim, Ex. 19, MCPHS 00004.  That letter stated that if Kim sought "to return to [MCPHS], [he] will be required to complete the student conduct process with a hearing upon [his] return."  Id.

On **October 23, 2024,** Kim was notified, after continuing to contact MCPHS personnel, that he was not to contact faculty, departments and MCPHS offices, other than through certain channels.  See Ex. 14, MCPHS 000133; see also Feb. 4, 2026 Trial Tr. 65:7-13.  As to Kim's complaints about other students, Dean Oliveri responded that "the matter is being investigated by the Dean of Students Office."  Ex. 14, MCPHS 000133.  Kim acknowledged receipt of the email, writing "Okay [Dean Oliveri], no problem."  Id.[13]

On November 4, 2024, Kim sent an email to MCPHS Student Affairs, submitting purported additional evidence concerning the October 5, 2024 email to Dean Theofane.  Nov. 4, 2024 7:33 PM email from Kim to Student Affairs, Ex. 21.

### K.    Kim Makes Demands and Threats Against MCPHS, its Faculty and Outside Legal Counsel

On **January 15, 2025,** while on medical leave, and notwithstanding the October 23, 2024 admonition, Kim sent a list of requests to Associate Provost Craig Mack ("Provost Mack") and

---

[13] To the extent there are date/time stamp discrepancies, it appears this is due to the location of the parties.  See Feb. 4, 2026 Trial Tr. 22:3-8.

Associate Provost Anna Morin ("Provost Morin"), requesting among other things cancellation of the disciplinary hearing, an apology, and a tuition refund from Fall 2023 through Fall 2024.[14] See Ex. 18, MCPHS 000145; see also Feb. 4, 2026 Trial Tr. 99:20-25, 100:1-5. As Provost Mack testified, they met with Kim via Zoom earlier that same day. Feb. 4, 2026 Trial Tr. 99:20-23; see also Kim's testimony, id. at 20:7-8.

According to Kim, he raised concerns about other students' misconduct, to which Provost Mack responded that "what they do does not matter." Id. at 20:12-14. Provost Mack disputes this, id. at 89:2-6, and the Court credits Provost Mack's recollection as to that portion of the conversation.

On **February 3, 2025,** Kim filed a complaint with the Department of Education's Office of Civil Rights ("the OCR Complaint"). Id. at 20:22-23. There is no direct evidence of **when** MCPHS actually became aware of the OCR Complaint.

On **February 12, 2025,** Provost Mack responded to Kim's inquiries from the January 15, 2025 Zoom meeting with a letter. In that letter, MCPHS declined the requests, reiterated that Kim was on leave, and gave explicit instructions on how to

---

[14] Kim also asked for several university officials to be fired, and a transfer to a university and program of his choice to be arranged by MCPHS "fully utilizing every resource at hand including alumni networks." Ex. 18, MCPHS 000145.

[25]

communicate with MCPHS personnel while on leave.  See generally Ex. 13.  Kim did not heed this warning.

On **February 18, 2025,** at 7:13 a.m., Kim submitted Spring 25 Town Hall Pre-Event Survey, which included comments such as:

- "Yeah why don't you ask Richard Lessard and Caroline Zeind why they send their little [expletive] minion Craig Mack to try and shut me up"
- "Yeah why does MCPHS allow for censorship of free speech except when kids call for the destruction of Israel with comments such as 'from the river to the sea?'"
- "University is god awful."
- "This campus is a hellhole."
- "I plan to shut this university down."

Ex. 15, MCPHS 000533-34.  Kim does not dispute that he authored these statements.  Feb. 4, 2026 Trial Tr. 66:25-67:3, 67:15-16.

That same day, Kim wrote to Provost Mack directly, stating among other things, "You will be hearing from our lawyers soon. Make no mistake, we find the university's antics despicable and characters like you even more abhorrent. **We will not only win, we will bring you to your knees**."  Feb. 18, 2025, email from Kim to Mack, Ex. 16 (emphasis added).  Kim testified that he sent this email, as well.  Feb. 4, 2026 Trial Tr. 69:1-8.  Provost Mack testified that he took the last statement as a threat to

[26]

his safety and others, as well as the other statements.  Id. at 99:3-6; 101:15-18; 102:5-12.  The Court credits this testimony and finds that the threat to **safety** was not the threat of a lawsuit.

On **February 19, 2025,** Kim wrote to Provost Mack that if he did not take certain actions, "we will sue you until we win. **Consider this a warning.**" Feb. 19, 2025 email from Kim to Mack, Ex. 16 (emphasis added).  Kim testified that he also sent this email.  Feb. 4, 2026 Trial Tr. 68:23-25, 69:7-8.  Mack testified that he took this email as a threat to his and others' safety, see id. at 99:3-5; 101:15-18, testimony this Court credits and, again, gives much weight.

That same day, on **February 19, 2025,** there is evidence that the United States Department of Education contacted Kim confirming that it had accepted his consent form for an investigation.  See Ex. 6.[15]

On **February 19, 2025,** Dean Oliveri, Provost Caroline Zenn, Provost Mack, Dean Morin, and Dean of Students Nathal Tara had a

---

[15] Other than Kim's speculation, there is no direct evidence in the record that MCPHS became aware of the OCR complaint at this time or any point prior to Kim's expulsion.  In fact, the evidence in the record reveals a letter from the Department of Health and Human Services dated January 14, 2026, "closing [a] case without further action" arising out of what seems to be a different October 10, 2025 complaint.  Jan. 14, 2026 letter from OCR Boston to Kim, Ex. 20, at 3.  It is not clear if this is related to the February 2025 OCR Complaint, or is a different complaint.

collaborative conversation about what to do concerning Kim's behavior.  Feb. 4, 2026 Trial Tr. 154:4-25.  Dean Oliveri recalls that the decision was made collectively based upon the events occurring since the Fall of 2024, and focused on the series of incidents after Kim's leave was processed.  Id. at 155:5-7, 16-23.  President Lessard participated as well.  Id. at 154:19-21.  The conversation about whether to remove Kim from MCPHS began in earnest when Kim sent the Survey and the emails to Provost Mack.  Id. at 156:9-13.  The meeting occurred after the Mack emails, and safety was taken into account.  Id. at 158:4.  Various options were considered to determine what was in the best interest of MCPHS.  Id. at 158:19-24.  Although Fazio was present, he did not direct anyone at MCPHS to expel Kim.  Id. at 162:1-5.  Neither Kim's OCR complaint, nor the September 24, 2024 Complaint were discussed at the meeting; there is no evidence that these issues were considered at all. Id. at 162:19-25, 163:1-6.  The two options discussed were dismissal, or to allow Kim to return from his medical leave. Id. at 163: 12-21.  The Court credits Dean Oliveri's testimony.

On **February 20, 2025,** Fazio wrote to Kim informing him not to contact MCPHS staff, to cease threatening communications, and that he was officially separated from the University for his continued conduct.  See Cease and Desist Letter, Ex. 4; see also Feb. 4, 2026 Trial Tr. 21:3-7.

[28]

On **February 20, 2025,** Kim was sent a no trespass order by MCPHS University Campus Police.  See No Trespass Order, Ex. 3.

On **February 24, 2025,** MCPHS wrote to Kim confirming that he was "officially separated from the University" and that "[t]he decision [was] final."  Feb. 24, 2025 Expulsion Letter from Jacinda M. Félix Haro to Kim, Ex. 5.  On his transcript, Kim was expelled as of February 25, 2025.  Feb. 4, 2026 Trial Tr. 21:17-19.

## L.   Kim's Post-Dismissal Misconduct

Kim's response to his dismissal was to wage a social media campaign spanning until at least December 2025 directed at MCPHS, its administration, and its outside counsel in this action, Fazio.  Much of this appears to be so-called "AI slop," that this Court, upon reflection, finds was intended to harass, disparage and intimidate.  See generally Ex. 17.[16]  The Court need not revisit the vitriolic posts in detail here, as they are evident in the record, but the content reflects poorly both on Kim's credibility, and as to merits of his claims, inasmuch as

---

[16]  Kim admitted that the posts contained in Ex. 17 were made by him.  Feb. 4, 2026 Trial Tr. 73:9.  This Court indicated during trial that the messages by Kim contained in Ex. 17 appeared to demonstrate Kim's "hostile state of mind towards [MCPHS], which does have a bearing both on [his] credibility and on the issues that are here."  Tr. 75:2-5.

[29]

it supports and justifies MCPHS's concerns -- including safety

concerns -- about Kim.[17]

**M.    Evidence Concerning Kim's Disability and the
        Accommodation Process**

Kim claims to have Adjustment Disorder. Feb. 4, 2026 Trial

Tr. 42:10-12.  Kim also testified that he was diagnosed in 2022

with Bipolar II in the Fall 2023 or Spring 2024 by providers at

Actium Health.  Id. 42:12-20.  The Court credits this testimony

---

[17]  Federal Courts are -- and must be -- safe spaces for
litigants to reach out for justice.  Individuals in this Court,
subject to this district's local rules, of course may "plead and
conduct their own cases personally or by counsel," and proceed
pro se.  This statutory right also bears a concomitant
responsibility of decorum.  While not held to every standard of
attorneys, "pro se status does not provide . . . a license to
engage in bad behavior," and parties proceeding pro se "must
conduct [themselves] with the same civility and decorum required
of members of the bar."  Leonard v. Town of Northborough, No.
4:25-CV-40044-MRG, 2026 WL 686526, at *2 (D. Mass. Mar. 11,
2026) (Guzman, J.) (sanctioning pro se plaintiff for harassing
opposing counsel).  Although the timeline is not entirely clear,
see Def.'s Opp'n Pl.'s Mot. TRO & Prelim. Inj. 8 ("To date Mr.
Kim continues to post alarming messages through his LinkedIn
profile, other social media accounts, and through e-mails
directed to the undersigned counsel and MCPHS community
members."), ECF No. 22, had Kim's conduct occurred during the
course of **this** litigation, the Court would not have hesitated to
intervene.  See United States v. Clemens, 738 F.3d 1, 4-5 (1st
Cir. 2013) (reciting procedural history where this Court
dismissed with prejudice a civil action by a pro se litigant
solely for scurrilous threats to opposing counsel in
litigation).  As judgment enters in favor of MCPHS here, the
action is dismissed on the merits, and there is apparently a
pending criminal matter against Kim based upon some of this
conduct (though the Court takes absolutely no position and makes
no inferences based upon the pendency of that matter) there is
no need to consider the details of Kim's social media activity
further.

inasmuch as Kim believes it, and MCPHS has not submitted any evidence to rebut it, but no medical documentation was provided to the Court at trial. Kim "believe[s] the medical documentation was shared with MCPHS counseling services" and "[is] not sure if counseling shared that with . . . Oliveri." Id. at 42:25-43:4. This is speculation and there is no evidence that Kim's claimed conditions were known by MCPHS.

The evidence in the record reveals that the OSAA exists for reporting and accommodating disabilities. See Student Handbook at 48-49, 90. Associate Dean of Students Adriana Pavlos, who oversees OSAA, testified that students who need accommodations are directed to OSAA, but that a student's medical information revealed to a counselor it would not be known by MCPHS because of HIPAA confidentiality. Feb. 4, 2026 Tr. 117:2-24; 119:23-120:1-4. Kim never "reached out to OSAA to seek accommodations." Id. at 44:15-17; see also id. 120:16-18. Though there is direct evidence that MCPHS was aware of Kim's behavior and that they assessed he needed mental health services, there is no direct evidence that MCPHS had any knowledge of Kim's disabilities. Kim does not meet his burden to demonstrate MCPHS was aware of his alleged disability or that he made a request for an accommodation.

### N.    Kim Files Suit and MCPHS's Counsel Seeks a Criminal Complaint

Kim filed this lawsuit on December 22, 2025.  Compl.

On December 23, 2025, it appears that Police Officer Anjos intended to seek a criminal complaint against Kim.  On December 29, 2025, Officer Anjos filed a criminal complaint upon report by Attorney Fazio, based upon Kim's April 7, 2025 posts "Kill, kill, kill" and "They say justice exists.  Tell that to the dead"; and a September 19, 2025 post "There is blood in the water.  I smell it coming."  See ECF No. 102-1.[18]

According to the public docket, a criminal complaint issued from the Boston Municipal Court after a Clerk Magistrate hearing, and apparently that matter is pending.  See Commonwealth v. Kim, 2602CR000326 (Boston Municipal Court – Roxbury).

---

[18]    After the close of the evidence, Kim sought to submit further evidence in the form of police reports and a criminal complaint, see ECF Nos. 102-1, 116-1, 116-2, which are hereby admitted as Exhibits 22, 23 and 24, respectively.  The Court finds the police reports and criminal complaint, contained in Exhibits 22 and 23, credible as to accurately reflecting what was reported to those officers.  Contrary to Kim's claims otherwise, on a preponderance of the evidence, the Court finds those police reports demonstrate that MCPHS was trying to avoid involving the authorities, but nevertheless had concerns.  Kim's police report, Ex. 24, while reflecting accurately Kim's perception, is not persuasive as to his claims in this action.

[32]

## III. RULINGS OF LAW

Kim has failed to prove any of his claims to a preponderance of the evidence, and therefore judgment shall issue in favor of MCPHS.

This Court dismissed Counts I, II, IV, V, VI, VII, VIII and IX, at the close of Kim's evidence, and took under advisement Count III.

### A. Judgment Shall Enter in Favor of MCPHS as to the Federal Claims (Counts I, II, and III)

#### 1. Count I -- Retaliation Claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et. seq., and Section 504 of the Rehabilitation Act ("Rehabilitation Act"), 29 U.S.C. § 794.

Judgment shall enter in favor of MCPHS as to Count I.

"Retaliation claims under the ADA [and] Section 504 . . . are analyzed under the same three-element framework: (1) the plaintiff engaged in protected conduct; (2) the plaintiff experienced an adverse . . . action; and (3) there was a causal connection between the protected conduct and the adverse . . . action." Connolly v. Woburn Pub. Schs., No. 1:22-CV-10695-JEK, 2025 WL 2777749, at *24 (D. Mass. Sept. 29, 2025) (Kobick, J.) (quoting Rae v. Woburn Pub. Schls., 113 F.4th 86, 100 (1st Cir. 2024), cert. denied, 145 S. Ct. 1431 (2025).

Kim claims that he was retaliated against as a result of his protected conduct, such as challenging MCPHS's actions in the disciplinary process, bringing his OCR complaint,

[33]

threatening litigation, and his dismissal.  Even presuming, without ruling, that Kim engaged in protected conduct and that MPCHS's conduct ultimately dismissing him and filing a criminal complaint against him was an adverse action, Kim fails to meet his burden that MPCH took any action as a result of any protected activity.  Rather, the evidence demonstrates that MCPHS dismissed Kim as a student and made a criminal complaint based upon Kim's escalating and threatening conduct.  In particular, the Court credits the testimony of Provost Mack who felt his safety was threatened by Kim's emails, and Dean Oliveri's testimony as to the decision-making process in February 2025 that led to Kim's dismissal that did not take into account his OCR complaint or litigation threat, but rather Kim's increasing misconduct.  While it is true that the emails also contained a litigation threat, two matters can coexist: that Kim made threats construed as potentially violent, and also that Kim threatened to sue.  There is no evidence, other than temporal proximity, that Kim's dismissal had anything to do with the threat of litigation or his complaints.  The record is replete with Kim's constant references to his "lawyers" and veiled threats to sue that did not raise any alarm at MCPHS.  Instead, it was only after Kim could not control himself and abide by the terms of his leave of absence, and continued to badger and threaten MCPHS that he was ultimately dismissed.

[34]

Kim's post-dismissal conduct was even worse, engaging in a social campaign to disparage and intimidate MCPHS administrators, faculty, and outside counsel, including posts that were considered threatening enough to file a criminal action. Again, the timing of Kim's lawsuit does not control here. Kim fails to meet his burden, and absent causation, the claim for retaliation under the ADA and Rehabilitation Act in Count I is not proven, and the Court need not rule on the other elements. Judgment shall enter in favor of MCPHS as to Count I.

### 2. Count II- Disability Discrimination and Failure to Accommodate under ADA and Section 504 of Rehabilitation Act

Judgment shall enter in favor of MCPHS as to Count II.

### a.    Title III ADA Claim

"To prevail on an ADA claim, a plaintiff must show that '(1) [he] is disabled within the meaning of the ADA; (2) he is otherwise qualified for participation in the program; (3) he **made a request for a reasonable accommodation**; and (4) [the defendant] **denied** the request.'" Finnegan v. Massachusetts Coll. of Pharm. & Health Scis. by & through Bd. of Trs., No. 23-CV-12997-DJC, 2024 WL 4772299, at *4 (D. Mass. Nov. 13, 2024) (Casper, J.) (quoting Brown v. Suffolk Univ., No. 19-cv-40062-DHH, 2021 WL 2785047, at *3 (D. Mass. Mar. 31, 2021))(alteration in original)(emphasis added).

[35]

Kim testified as to his alleged disability of adjustment disorder, and that MCPHS counseling was aware of it. Kim believes, but did not know, whether his alleged disability was shared with Dean Oliveri. Feb. 4, 2026 Trial Tr. 42:23-43:4. There is no evidence that Dean Oliveri was aware of Kim's particular diagnoses or purported disability. Further, Dean Pavlos testified that MCPHS counseling would not notify her, as part of OSAA, of a diagnosis because of HIPAA guidelines. Feb. 4. 2026 Trial Tr. 119:19-120:4. Kim has failed to meet his burden that outside of a mental health counselor, MCPHS was even aware of Kim's disability.

Even if MCPHS was aware of Kim's purported disability, it is undisputed that Kim never sought an accommodation from MCPHS, nor was one refused; in particular, Kim admittedly did not attempt to engage with OSAA which is set up to provide accommodations to students. Kim's failure to seek an accommodation is fatal to his claim. Indeed, "neither the ADA nor Rehabilitation Act requires a university or its employees to investigate and identify reasonable accommodations for a student with a disability absent a request." Brown, No. CV 19-40062-DHH, 2021 WL 2785047, at *5 (D. Mass. Mar. 31, 2021) (Hennessy, U.S.M.J.)(citing Axelrod v. Phillips Acad., Andover, 46 F. Supp. 2d 72, 84 (D. Mass. 1999) (Harrington, J.)).

[36]

### b.    Section 504 Rehabilitation Act Claim

"To prevail on a Section 504 claim, a plaintiff must prove four elements: '(1) that [he] is disabled; (2) that [he] sought services from a federally funded entity; (3) that [he] was otherwise qualified to receive those services; and (4) **that [he] was denied those services solely by reason of [his] ... disability.'"** J.S.H. v. Newton, 164 F.4th 142, 152 (1st Cir. 2026) (quoting Thiersaint v. Dep't of Homeland Sec., 85 F.4th 653, 669 (1st Cir. 2023)) (emphasis added).

Even presuming without ruling Kim met the first three elements, Kim has not met his burden that he was denied any services **solely** on the basis of his disability.  As set forth above, the record demonstrates that Kim was dismissed while on his second voluntary medical leave because of his increasingly hostile misconduct.  Kim has failed to meet his burden that his threat of litigation or the OCR report had **any** input into MCPHS's decision to dismiss him or file a criminal complaint. The record demonstrates good reason for MCPHS's safety concerns, and MCPHS did not have a legal obligation to tolerate Kim's actions simply because Kim brought a complaint with OCR or threatened to sue.  This Court rules that on a preponderance of the evidence, Kim has not proven that MCPHS acted at all -- let alone solely -- as a result of this disability.

[37]

### 3. Count III – Race and/or National Origin Discrimination under Title VI Civil Rights Act 1964.

Judgment shall enter in favor of MCPHS as to Count III.

"Title VI of the Civil Rights Act mandates that '[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving [f]ederal financial assistance.'" Stand With US Ctr. for L. Just. v. Massachusetts Inst. Tech., 158 F.4th 1, 11 (1st Cir. 2025) (quoting 42 U.S.C. § 2000d) (alteration in original). "[A] school can be held liable if it was 'deliberately indifferent' to 'severe, pervasive and objectively offensive' harassment that 'caused the [plaintiff] to be deprived of educational opportunities or benefits.'" Id. (quoting M.L. ex rel. D.L. v. Concord Sch. Dist., 86 F.4th 501, 511 (1st Cir. 2023)) (citations omitted). Indeed, "a student can file a lawsuit based on race-based harassment under Title VI only if: (1) the harassment was both 'severe' and 'pervasive'; (2) a school official with authority to take corrective action had 'actual' knowledge of the harassment; and (3) the school showed 'deliberate indifference' to it." Victim Rights L. Ctr. v. United States Dept. of Educ., 788 F. Supp. 3d 70, 78 (D. Mass. 2025), appeal dismissed, No. 25-1787, 2026 WL 374364 (1st Cir. Jan. 15, 2026). Of course, it is well settled that "Title

[38]

VI does not require schools to craft perfect solutions, nor does it entitle students to their preferred remedial demands,"; rather, "[i]t simply requires that a school's response to known harassment not be clearly unreasonable." Stand With US Ctr. for L. Just., 158 F.4th at 23 (citation modified).

Kim proved that he made claims of racial harassment by other students to MCPHS.  That alone is not, however, enough to prevail.  Even presuming without ruling that the racial harassment claims were severe and pervasive, Kim's claim fails because he has not shown deliberate indifference by MCHPS by a preponderance of the evidence.  Indeed, the preponderance of the evidence is that the hand gesture claim was "resolved," but Kim asserts that it was merely "dismissed."  Either way, the evidence shows that MCPHS was not indifferent to the complaint.  As for the claim made in the email to Dean Theofane, there is no evidence as to what occurred, other than Dean Theofane responded that the information would be provided to the hearing officers, and that hearing did not occur because of Kim's leave of absence.  See Oct. 4, 2024 2:10 PM email from Dean Theofane to Kim, Ex. 21; Oct. 8 2024 letter from Dean Theofane to Kim, Ex. 19, MCPHS 00001.  Again, there is no evidence of any further action on that claim, or indifference.  Ultimately, Kim's disappointment or lack of knowledge of MCPHS's actions taken with respect to his complaints is insufficient.  See Stand With

[39]

US Ctr. for L. Just., 158 F.4th at 22 ("But as our caselaw makes clear, Title VI does not subject a private entity to damages liability merely because its response did not deter or eradicate the alleged peer harassment."). Count III is therefore unproven.

### B. Judgment Shall Enter in Favor of MCPHS as to the State Law Claims (Counts IV, V, VI, VII, and VIII and IX)

Kim's state law claims, counts IV, V, VI, VII, VIII, and IX, fare no better. All fail on the merits because Kim has not met his burden of proof.

As for Kim's civil rights claims under the Massachusetts Constitution, these claims fail. "To state a viable MCRA claim, a plaintiff must demonstrate that '(1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with or attempted to be interfered with; and (3) such interference **was by threats, intimidation, or coercion.**'" Barron v. Kolenda, 491 Mass 408, 423 (2023) (emphasis added) (quoting Glovsky v. Roche Bros. Supermarkets, Inc., 469 Mass. 752, 762 (2014). Kim fails, as a threshold matter, to meet his burden that there was any interference (or attempted interference) with his constitutional or statutory rights. Further, the record does not support a finding of any threats, intimidation, or coercion by MCPHS.

[40]

In fact, it is just the opposite. Kim points to a criminal complaint being brought against him the day after Kim filed this action. Kim ignores the basis of the criminal complaint, and the ample evidence of threatening behavior made by Kim which forms the basis of the criminal complaint (though the Court takes no position as to the sufficiency of this evidence with respect to the criminal complaint).

Based upon Kim's pre-dismissal and post-dismissal conduct, the Court rules that Kim has failed to meet his burden that MCPHS or its counsel did anything unlawful in keeping the police informed as to Kim's barrage of social media and other communications. To the contrary, based upon Kim's evidence, MCPHS's response was measured, restrained and largely private. The filing of the criminal complaint against Kim was, on this record, a last resort, after months of Kim's haranguing conduct. The fact that the criminal complaint was filed the day after Kim filed suit is not dispositive, and more importantly is not persuasive based upon the entirety of the record. Count IV therefore enters in favor of MCPHS and against Kim.

Turning to the breach of contract/good faith and fair dealing claims, Count V, that claim fails because Kim has not proven there is any contract between MCPHS and Kim, nor a breach thereof. See Finnegan, 2024 WL 4772299, at *7. Count V therefore enters in favor of MCPHS and against Kim.

[41]

As to Kim's Chapter 93A claim, Count VI, that claim fails because Kim has not proven MCPHS acted in "trade or commerce," see id., and Kim has not proven MCPHS's actions to be "unfair or deceptive," in any event.  Judgment therefore enters in favor of MPCHS and against Kim as to Count VI.

Kim has failed to prove his claim for breach of fiduciary duty, Count VII, because he has not established any duty owed to him or breach thereof, by MCPHS.  See UBS Fin. Sers., Inc. v. Aliberti, 483 Mass. 396, 405 (2019) ("To establish a claim of breach of fiduciary duty under Massachusetts law, 'there [(1)] must be a [fiduciary] duty [(2)] owed to the plaintiff by the defendant and [(3)] injury to the plaintiff [(4)] proximately caused by the [defendant's] breach [thereof].'") (quoting Estate of Moulton v. Puopolo, 467 Mass. 478, 492 (2014)).  Kim claims that Do, his guardian, who is also a representative to scout students for MCPHS created a fiduciary duty between Kim and MCPHS.  Do did not testify at trial, and there is no persuasive evidence as to the nature of the alleged duty.  Even if a duty could somehow be established on the limited evidence at trial, there is no breach of any duty based upon the actions of MCPHS here.  Indeed, Kim's situation is wholly self-imposed due to his own misconduct.  Kim has failed to meet his burden to prove proximate cause, as well as damages purportedly caused by

[42]

MCPHS's actions.   Judgment enters in favor MCPHS and against Kim on Count VII.

Kim also failed to prove his promissory estoppel claim, Count VIII.  "The elements of promissory estoppel under Massachusetts law are similar to breach of contract, but without the element of consideration."  Cercare Health, LLC v. Philips N.A., LLC, No. CV 24-11618-WGY, 2026 WL 396273, at *7 (D. Mass. Feb. 12, 2026).  In particular, "[t]o prevail on a promissory estoppel claim, [Kim] must show (1) a representation intended to induce reliance; (2) reasonable reliance on that representation; and (3) resulting detriment."  Id. (quoting Tody's Serv., Inc. v. Liberty Mut. Ins. Co., 496 Mass. 197, 201 (2025).  Here, Kim has failed to establish **any** promise or breach thereof by MCPHS. Judgment therefore enters in favor of MPCHS and against Kim as to Count VIII.

Finally, Kim has failed to meet his burden to establish intentional interference with advantageous relations (Count IX). "For a Plaintiff to succeed on a claim of intentional interference with an advantageous business relationship, they must assert that:  '1) the plaintiff had a contract or advantageous business relationship **with a third party,** 2) the defendant **knowingly induced the third party** to break the contract or to forgo the business relations, 3) the defendant's interference was **improper in motive or means,** and 4) the

[43]

plaintiff was harmed by the interference.'" <u>Sheldon</u> v. <u>F.W. Webb Co.</u>, 801 F. Supp. 3d 59, 70 (D. Mass. 2025) (Guzman, J.) (quoting <u>Kelleher</u> v. <u>Lowell General Hospital</u>, 98 Mass. App. Ct. 49, 54 (2020)) (emphasis added).  Here, though Kim testified as to his intent to open a pharmacy in South Korea, there is no evidence that MPCHS knew of **any** advantageous business relationship Kim had with a third party, or that MCPHS induced **any** third party to break any contract or forgo any business relationship.  Feb. 4, 2026 Trial Tr. 70:6-20.  Again, this Court finds and rules that Kim's dismissal from MCPHS is self-imposed by his own misconduct.  Judgment therefore enters in favor of MPCHS and against Kim as to Count IX.

Accordingly, the state law claims Counts V, VI, VII, VIII, and IX were dismissed at the close of the evidence, for the reasons stated on February 5, 2026, and herein.

## IV.  REMAINING PENDING MOTIONS, NOTICES AND STATEMENTS

Kim filed pre-trial motions, and post-trial motions, notices and statements.  Unless otherwise referenced, **none** of the information in these documents was considered with respect to the findings and rulings in this action.

### A. Pending Motions

The Court resolves Kim's pending motions as follows:

Kim's Motion for a Protective Order, ECF No. 13,  Kim's Motion for Limited Early Discovery and In-Camera Review of

[44]

Assertedly Privileged Materials, ECF No. 20, Kim's Emergency Motion for Leave to File a Reply, ECF No. 24, Motion for Limited Document Production or, in the Alternative, to Limit the Scope of Adjudication, ECF No. 28, Kim's Motion to Impeach Defendant's Witnesses and to Disregard Defense Arguments not Supported by the Civil Record, ECF No. 54, are each hereby **DENIED as MOOT** inasmuch as the trial has been held and judgment is entering this day.

Kim's Motion for Judicial Findings and, in the Alternative, Referral, ECF No. 53, is hereby **DENIED.**

Kim's Post-Trial Motion to Formally Admit Exhibits Previously Marked and Examined, ECF No. 90, is **ALLOWED in part and DENIED in part, only** to the extent that this Court has assigned numbers to the admitted Exhibits, and such exhibits are admitted for all purposes, unless otherwise indicated by the Court. Exhibits with letters, i.e. Exhibits A and B, were **not** admitted into evidence. The Court considered only the evidence admitted at trial or as indicated above, and expressly did **not** consider any other documents or information provided to the Court (i.e., notices and documents submitted post-trial).

Kim's Post-Trial Motion to Correct and Supplement the Record Regarding Incomplete Admitted Exhibit 2 & 19, ECF No. 92 is hereby **DENIED.**

Kim's Motion for Access to Digital Audio Recordings of Proceedings, ECF No. 93, is hereby **DENIED**.  The Official Court Reporter has prepared official transcripts of all of the proceedings in this matter, and unless the Court Reporter informs this Court otherwise, and absent further order of the Court, they remain the official record of this case.  See ECF Nos. 106-108.

Kim's Motion to Reopen the Evidentiary Record for the Limited Purpose of Admitting Chapter 93A Demand Letters, ECF No. 94 and Proof of Statutory Compliance, ECF No. 94, and Kim's Motion to Correct Clerical Filing Errors and Substitute Corrected Motion and Exhibits, ECF No. 96, are each hereby **DENIED** inasmuch as even presuming without ruling the statutory prerequisite for suit was met, the claim fails on alternative grounds as set forth supra.

Kim's Motion to Restrict Access and Replace Exhibit Containing Unredacted Personal Identifiers, ECF No. 103, is **DENIED** without prejudice to filing a motion with a proposed redacted exhibit.

Kim's Motion for Sanctions for Pattern of Noncompliance with Subpoenas, ECF No. 111, is hereby **DENIED** as untimely and therefore waived.  The time to have made such a motion was prior to Kim resting his case.

[46]

Kim's Supplemental Motion for Sanctions Based on Representations Supporting Protective Order, ECF No. 112, is hereby **DENIED** as untimely and therefore waived.  The time to have made such a motion was prior to Kim resting his case.

Kim's Motion to Correct and Supplement the Record Pursuant to Fed. R. App. P. 10(e), ECF No. 115, is **DENIED** as there is no pending appeal, and substantially for the reasons set forth in Defendant's Opposition to Plaintiff's Motion to Correct and Supplement the Record Pursuant to Fed. R. App. P. 10(E), ECF No. 124; see Fed. R. App. P. 1(a)(1) ("These rules govern procedure in the United States courts of appeals.").  Moreover, the Court is concerned whether Kim's very detailed purported corrections are based upon a non-sanctioned recording of the proceedings, which would be prohibited under Local Rule 83.5.3(a), or his misunderstanding that the Official Transcript cannot be altered posttrial by an "errata sheet."[19]  Indeed, some of the proposed

---

[19] Kim's Supplemental Errata Sheet for Trial Commenced 02/04/26, ECF No. 139, which Kim asserts are typographical errors, is a matter to be first addressed with the Official Court Reporter.  Similarly, Kim appears to dispute the accuracy of some portions of the transcript. See Errata Sheet for Trial Commenced 02/05/26, ECF No. 110.  The Court takes no position as to Kim's proposed typographical or other corrections.  They do not appear to have any effect on the result of this action.  In any event, Kim shall contact the Court Reporter in the first instance.  The Official Court Reporter is not ordered to do anything at this time.

[47]

"corrections" suggest a manner of speaking that this Court knows it did not utter: i.e. referring to counsel by their first name.

Kim's Motion to Amend to Conform to the Evidence Under Fed. R. Civ. P. 15(b)(2) ("the Motion to Amend"), ECF No. 118, is **DENIED**. "Rule 15(b)(2) [of the Federal Rules of Civil Procedure] states, in relevant part, that '[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings.'" In re Fustolo, 896 F.3d 76, 83-84 (1st Cir. 2018)(quoting Fed. R. Civ. P. 15(b)(2)). Kim's Amended Complaint did not raise a 42 U.S.C. § 1983 First Amendment retaliation claim against MCPHS. Kim did not try the case as such. The basis of Kim's First Amendment claim was questioned by the Court at trial. As Kim concedes in his motion, in response he expressly tied the First Amendment issue to his MCRA claim[20]-- a claim that this Court has already ruled was unproven.

---

[20] Though Kim argues it in his motion, he does not provide a reference. The full colloquy:

> THE COURT: I basically know the period of surveillance. I have a, um, now a fairly understandable scenario of what happened prior to the expulsion. And you think things happened after the expulsion that -- for which you get a remedy here?
> MR. KIM: Yes, your Honor.
> THE COURT: Tell me.
> MR. KIM: I believe the defense was trying to use law enforcement to chill free speech.
> THE COURT: **Is that pled? I don't see it.**
> MR. KIM: **The MCRA, sir, the Massachusetts Civil Rights Act.**

[48]

To wit, Kim did not prove there were violations of his constitutional rights, nor the additional requisite element under the MCRA of threats, intimidation or coercion.

The failure to prove a violation of his First Amendment rights under the MCRA makes amending the complaint to add a Section 1983 claim futile in any event. As this Court has ruled, there is nothing wrong with MCPHS working closely with law enforcement to stop Kim's relentless harassment of MCPHS and its counsel. Kim has not proven by a preponderance of the evidence that MCPHS interfered with his First Amendment rights at all. Kim's characterization of his retaliatory posts as mere "criticism" is simply unfounded on the record before the Court. Furthermore, MCPHS has not consented to this unpled claim. Kim wisely does not argue express consent, and the Court rules there was no implied consent where Kim identified his First Amendment claim as arising under his MCRA claim without a whisper of Section 1983. Indeed, "[i]t is the defendant's inalienable right to know in advance the nature of the cause of action being asserted against him, and thus it is not enough that an issue may be inferentially suggested by incidental evidence in the

---

THE COURT: **And that is one of your claims?**
MR. KIM: **Yes, sir.**
THE COURT: **All right. Then we'll hear what evidence you have on that subject . . .**
Feb. 4, 2026 Trial Tr. 33:6-21 (emphasis added).

[49]

record; the record must demonstrate that the parties understood that the evidence was aimed at an unpleaded issue." In re Fustolo, 896 F.3d at 84 (cleaned up). That did not happen here. The motion is **DENIED**.

Kim's Motion for Reconsideration of Prior Denial without Prejudice and for Limited In Camera Review under the Crime-Fraud Exception, ECF No. 121, is hereby **DENIED**.

Kim's Request for Specific Findings and Clarification, ECF No. 122, and his Final Post Trial Statement, ECF No. 128, submitted in support, are construed as proposed supplemental findings of fact and rulings of law, and are **DENIED as MOOT**.

Kim's Motion to Compel Disclosure of Insurance Agreements pursuant to Rule 26(a)(1)(A)(iv), ECF No. 130, as well as his Motion to Compel Rule 26(a)(1) Initial Disclosures, ECF No. 131, are each hereby **DENIED** inasmuch as the discovery ordered in this action was limited at the January 29, 2026 hearing and, in any event, MCPHS has prevailed in this action.

Kim's Second Motion to Supplement and Clarify the Record, ECF No. 135 (and Notice in Further Support, ECF No. 137), is **DENIED** as untimely.

Kim's Motion to Redact Transcript to Redact Personal Address from Transcripts, ECF No. 138, is **ALLOWED in part** only to remove Kim's current residential house or apartment number and street address, and is otherwise **DENIED in part without**

[50]

**prejudice.**  Kim shall submit proposed redactions of the transcript by page and line number within 14 days to the Court and to the Official Court Reporter.  Any proposed redaction will be limited to redacting the number and street name of Kim's current residential address.

Kim's Motion to Compel Limited Production and Supplement the Record, ECF No. 149, is **DENIED.**  To the extent that motion could be construed as seeking exhibits from the Court, the original exhibits will be placed on the docket in a restricted format with copies to be provided to the parties, and the originals returned jointly to the parties in the ordinary course by the Clerk.

Kim's Motions for Leave to File Reply Briefs, ECF Nos. 133, 134, 145 and 157, are hereby **ALLOWED,** and the replies are deemed filed; Kim should not file the replies again.

### B. Notices and Statements

The Court addresses Kim's Notices and Statements as follows:

The Court rejects as untimely and does not consider (but does not strike) Kim's Comprehensive Statement for the Record Regarding Necessity of Disco very, Bad Faith, Pretext, and Title VI Intent, ECF No. 98; Kim's Statement for the Record Regarding Denial of Discovery and Resulting Prejudice, ECF No. 99; Kim's Statement Regarding Student Handbook Versions, Interim Measures,

and Discovery Prejudice, ECF No. 101; Kim's Notice of Supplemental Evidence to Causation and Retaliatory Motive, ECF No. 117; Kim's Notice of Supplemental Evidence Regarding Town Hall Survey Context and Contemporaneous Student Response, ECF No. 119; Kim's Statement of Plaintiff (Clarification of Record Regarding Social Media Evidence), ECF No. 120; Kim's Notice Supplemental Submission Regarding Damages, ECF No. 129; Kim's Notice of Supplemental Exhibit for Record Clarification, ECF No. 142, Kim's Supplemental Point on Pretext (Selective Application of "Safety" Rationale), ECF No. 146; Kim's Notice of Supplemental Clarification Regarding Damages Impact, ECF No. 147; and Kim's Notice of Supplemental Exhibit Regarding Formal Complaint and Institutional Knowledge, ECF No. 148.

As for Kim's Notice for the Record Regarding Post-Trial Developments Relevant to Institutional Ratification and Promotions, ECF No. 141, even if Kim is correct that a witness was promoted at some point, it is completely irrelevant to the trial record here. Its content is therefore not considered.

As for Kim's Notice of Supplemental Authority, ECF No. 140, the Court is aware of the cases cited, and that notice is received.

## V. ORDER FOR JUDGMENT

For the reasons stated above, Kim has failed to meet his burden of proof at trial as to all counts.  Judgment shall enter in favor of the Massachusetts College of Pharmacy and Health Sciences and against Jaehyun Kim on all counts; the parties shall each bear their own costs.

SO ORDERED.

William G. Young
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[21]

---

[21]  This is how my predecessor, Peleg Sprague (D. Mass 1841-1865), would sign official documents. Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 48 years.

[53]